UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LYNN WOLFE, as Personal
Representative of the ESTATE OF
DANIEL WOLFE, on behalf of the
Estate, and on behalf of Daniel Wolfe's
Survivor, LYNN WOLFE,

CASE NO.: 5:10-CV-663-Oc-10DAB

     Plaintiff,

vs.

FLORIDA DEPARTMENT OF
CORRECTIONS,

     Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II AND III OF PLAINTIFF'S FIRST AMENDED COMPLAINT

**COMES NOW** the Defendant, FLORIDA DEPARTMENT OF CORRECTIONS, by and through undersigned counsel, and hereby moves this Honorable Court for summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure as to Counts II and III of the Plaintiff's First Amended Complaint. As grounds, the Defendant states that there is no genuine issue as to any material fact and the Defendant is entitled to judgment as a matter of law. In support thereof, the Defendant would state as follows: [1]

### I.    STATEMENT OF UNDISPUTED FACTS

It is undisputed that Daniel Wolfe ("Wolfe"), deceased, was "an inmate confined in Lake Correctional Institution in Clermont, Florida, a correctional facility owned and operated by the

---

[1] Certain documents cited to in this motion have been designated by the Defendnat as "Confidential," in that they directly or indirectly have potential security implication for the Florida Department of Corrections at one or more of correctional facilities. Per the Court's Order, the parties have exchanged certain such documents pursuant to a dually executed Confidentiality Agreement. Pursuant to same, and in accordance with Court's local rules, motion to file the documents under seal will be filed in the comings, and the confidential documents to be filed with the Court upon entry of an Order granting submission under seal.

[Department]."   (D.E. 5, p. 2-3)[2]  Wolfe was sentence to approximately five years in the custody of the Florida Department of Corrections. (D.E. 51-1.)  Prior to being convicted for, among other things, burglary of a dwelling; grand theft; grand theft of a motor vehicle; introducing contraband into a detention center; and dealing in stolen property (*see* D.E. 51-1)[3], Wolfe primarily resided with his mother Lynn Wolfe.  (D.E. 51-2,  p. 23-27.)  He is believed to have completed at least the 8[th] grade, before dropping out of school.  (D.E. 51-3.)  Wolfe self-reported that he started smoking marijuana at the age of 13 years old; he also acknowledged using alcohol, cocaine, and tobacco (1/2 to 1 pack each day) during his teenage years.  (D.E. 51-4, p. 569; *see also* D.E. 51-5, p. 71:12-14.)

Both prior to, and during his incarceration, Wolfe had the medical condition of asthma. (D.E. 51-2, p. 27:8-14; D.E. 51-5, p. 27:1-7.)  Despite this condition, Wolfe was an active young man, participating in music (D.E. 51-2, p. 17:10-25), football and basketball (*Id.*, p. 13:7-11). When not serving time in the juvenile correctional facilities and the Broward County Jail (*Id.*, p. 23:1-17, 29:7-19), Wolfe would occasionally work various jobs, which included air-conditioning repair, automotive care, car washing, and construction work.  (*Id.*, p. 28:13-21.)  Additionally, he assisted his mother with vacuuming, painting, doing the dishes, and fixing electronics.  (*Id.*, p. 35.)  However, his availability was limited in the years leading up to his incarceration, as he spent "863 days" in jail from early 1999 to November 26, 2002 – the date of conviction. (*Id.*, p. 30:1-13.)

After being sentenced on November 26, 2002, Wolfe served periods of his sentence at various facilities operated by the Florida Department of Corrects, which included, but was not

---

[2] The facts presented herein are undisputed by the Defendant for the purposes of this motion only.  No part of this motion is intended to constitute a waiver of the Defendant's right to present a defense as to the validity of any statements included in this motion which may be presented at trial.

[3] Lynn Wolfe was unable to recall with specificity the crimes for which Daniel Wolfe had been convicted.  (D.E. 51-2, p. 20–24.)

limited to, Lancaster Correctional Institute, Taylor Correctional Institute, Brevard C.I. and the Everglades Correctional Institute. (D.E. 5, ¶ 15; *see* D.E. 51-2, p. 45:20–46:2; 104:25–105:12.) In September 2004, Wolfe filed a petition with the Department a request for protection services, seeking transfer from Everglades C.I. (*See* D.E. 51-6.)[4] On November 1, 2004, upon confirmation of the necessity of the transfer, Wolfe was moved to Lake Correctional Institute (hereinafter "Lake C.I.") in Clermont, Florida. (D.E. 5, ¶ 14.)

Both leading up to and during his incarceration at Lake C.I., the Department was aware of Daniel Wolfe's condition, and the Department's Physicians treated him for same. (D.E. 51-2, p. 21-22.) In addition to the standard medical examinations provided to inmates, Wolfe was enrolled in the Department's Chronic Illness Clinic focused on respiratory conditions. (*See* D.E. 51-5, p. 44-45.) Through enrollment in the *Respiratory Clinic* at Lake C.I., Wolfe was scheduled to be examined by physicians approximately every three months. (D.E. 51-17.) During the quarterly *Respiratory Clinic* appointments, Daniel Wolfe would receive counseling/education as to his illness and treatment. (*See e.g.* D.E. 51-17)

In addition to the *Respiratory Clinic*, Wolfe was prescribed various well-known medications for the treatment of his asthma. The medications included Singulair, Albuterol and Q-Var. (*Id.*) The combination of medications prescribed to Wolfe were in accord with the proper treatment of asthma. (D.E. 51-5, p. 44-45.)

At all times relevant hereto, the Department employed security classifications for inmates ("HO status") that ranged from 1 to 5, with 5 being the highest security risk. (*See* D.E. 51-7, p. 18:21–19:13.) Upon arrival at Lake C.I., Wolfe was house in Echo Dorm, which was used to house HO "4's and 5's." (D.E. 5, ¶ 17; D.E. 51-7, p. 19:15-17.) The HO level is regularly the

---

[4] The Transfer request was not related to any medical conditions. Rather, Wolfe was fearful for her well being due to conflicts with members of two gangs at the facility.

controlling factor for general inmate housing placement decisions, except in those situations where the medical staff finds a reason to override the placement due to concerns for the inmates medical wellbeing. (*See* D.E. 51-8, p. 58:21-59:5.)

At approximately 1:15 a.m. on November 26, 2004, Wolfe experienced a sever asthma attack. (D.E. 51-5, p. 35:1-5.) Correctional officers and a Licensed Practical Nurse responded to Wolfe's cell, and EMS services arrived outside of E-Dorm. (D.E. 51-9, p. 41:9–42:3.) Wolfe was transported to the local hospital emergency room for treatment. (D.E. 51-5, p. 35:1-5.) After making a good recovery for the asthma attack, he was brought back to Lake C.I. and resumed his incarceration. (*Id.*, p. 38:22–39:10.) Wolfe was released back to the custody of FDOC. At some point after his return to Lake C.I., Wolfe was assigned to Echo Dorm. (D.E. 51-10, p. 126:9-12.)

In the year and seven months between the November 26, 2004 emergency and the August 3, 2006 date of death, Wolfe is reported to have suffered approximately eight more asthma-related episodes. (*See* D.E. 51-5, p. 34:19-22.) The inmate's medical records reflect that he requested to return to his cell in "Echo Dorm" after the treatments. (D.E. 51-10, p. 124:5-18.)

Wolfe continued to reside at Lake C.I. for the remainder of his incarceration. During that time, Daniel continued exercising (D.E. 51-2, p. 81:2-13; D.E. 51-10, p. 136), singing (D.E. 51-11, p. 10:9-20), and drawing. He even developed the skill of tattooing. (*Id.*, p. 17:9-20.) In addition, Daniel Wolfe was even seen smoking cigarettes "every now and then." (D.E. 51-12, p. 51:15-17.) All of this while he continued to experience symptoms from asthma.

On the early morning of August 3, 2006, Wolfe notified his cellmate, David Kitt, that Wolfe "couldn't breathe," and Kitt began to kick the cell door in an attempt to "get the officer's attention." (*Id.*, p. 11:6; *See* D.E. 51-7, p. 61-63.) Ackerman respondend, and then alerted medical personnel by way of his personal radio at 3:40 a.m. (D.E. 51-7, p. 64:8-19; D.E. 51-12,

p. 13:19-21; D.E. 51-13; See D.E. 52-21.) Nurse Presley, a Licensed Practical Nurse, responded to Wolfe's cell in Echo Dorm, and, with the assistance of the Correctional Officers, transported Wolfe back to the on-site medical facility *via* stretcher placed on the medical center's electronic cart.(D.E. 52-20, p. 51-52.)[5] An ambulance was called at 3:52 a.m. by Correctional A. Hartzog in Lake C.I.'s Main Control Room. (D.E. 51-13.) An ambulance arrived at Lake C.I. at 3:56 a.m. (*Id.*), and was escorted to the infirmary by 3:59 a.m. (*Id.*).

At 4:02 a.m., Wolfe was pronounced dead by the Emergency Medical Services.(D.E. 5, ¶ 39). An autopsoy was performed, from which it was determined that Wolfe died from "[a]sthmaticus,... a prolonged asthma attack." (D.E. 51-10, p. 119:11-13.) The toxicology report included in the Medical Examiner's report shows positive findings of Albuterol and Benadryl in Wolfe's system. (*Id.*, p. 122:25–123:2.) Additional non-prescribed medications were found amongst Wolfe's personal belongings, which included the beta-blocker Timolol. (D.E. 51-14.)

Lynn Wolfe, as the P.R. for the estate of Daniel Wolfe, has filed this lawsuit claiming violations of Florida's Wrongful Death Act and the American's with Disabilities Act, 42 U.S.C. § 12101 *et. seg.* (D.E. 5.)

## II.   LEGAL STANDARDS AND APPLICABLE LAW

### A. Summary Judgment

Summary Judgment is appropriate where the records show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for

---

[5] Plaintiff's medical expert, Dr. Jay Falk, found that nothing done by Nurse Pressley was medically negligent or a departure from the standard of care. (D.E. 51-5, p. 62:19-22.)

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). The moving party bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believe demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quotation marks omitted). When a moving party points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324-25.

Once the moving party meets its burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Mere conclusory statements or allegations without specific supporting facts are insufficient to defeat the motion. *Evers v. Gen. Motors Corp.*, 770 F.2d 984 (11th Cir. 1985).

### B. The Applicable Standard for Plaintiff's Disability Claims Under the ADA are Those In Effect at the Time of the Alleged Discrimination

"A court is to apply the law in effect at the time it renders its decision unless doing so would result in manifest injustice, or there is statutory or legislative history to the contrary." *Mannings v. School Bd. Of Hillsborough County*, 826 F.Supp. 1404 (M.D. Fla. 1993); *see Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, L.Ed. 2d 476 (1974). The American's with Disability Act was signed into effect by President George H.W. Bush and was originally inacted in 1990, and remained in effect until the ADA Amendments Act ("ADAAA") went into effect on January 1, 2009. Congress did not state in the ADAAA or

6

indicate in the legislative history whether the amendments should govern cases arising before January 1, 2009. Courts throughout the country have addressed the issue, and have held with general uniformity that the ADAAA <u>does not</u> apply retroactively. *See, e.g., Lawson v. Plantation General Hospital*, 704 F.Supp. 2d 1254 (S.D. Fla. 2010); *Richardson v. Honda Mfg. of Ala., Inc.*, 635 F.Supp. 2d 1261, 1272 (N.D. Ala. 2009); *Primmer v. CBS Studios, Inc.*, 667 F.Supp. 2d 248, 257 (S.D.N.Y. 2009) (citing, *inter alia*, *Lytes v. DC Water & Sewer Auth*, 572 F.3d 936 (D.C. Cir. 2009); *Milholland v. Sumner County Bd. of Educ*, 569 F.3d 562, 567 (6th Cir. 2009)); *compare Shannon v. Potter,* 335 Fed. Appx. 21 (11th Cir. 2009) (discussing the fact that the 11th Circuit has yet to issue a published opinion addressing the potential retroactive effect of the ADAAA).

The quantum of circumstances relevant to the claims at issue in this matter all occurred prior to the ADAAA coming into effect. As the ADAAA contains no language indicating that it applies retroactively, it would work an injustice on parties if they were to be held liable for conduct that they would have reasonably believed at the time was in compliance with the law.

## III.   WOLFE DID NOT HAVE A DISABILITY WITHIN THE MEANING OF THE ADA

Title 42 U.S.C. § 12132 prohibits discrimination against a qualified individual with a disability because of the disability of such individual. There must be a casual connection between the disability and the alleged discrimination. *Brown v. Chatman,* 2010 WL 3717283 at 4 (M.D. Ga. 2010). "As a preliminary matter, a plaintiff must establish that he or she is disabled in order to maintain a cause of action under the ADA...." *Smith v. Tangipahoa Parish School Board* (E.D. La. 2006) (*citing Mason v. United Air Lines, Inc.*, 274 F.3d 314, 316 (5th Cir. 2001).

The term "disability" is defined under Title 42 U.S.C. § 12102 with respect to an individual as:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) records of such an impairment; or
>
> (C) being regarded as having such an impairment."

42 U.S.C. § 12102(2)(A). While the ADA does not specifically define "records of such an impairment," courts have generally accepted education, medical and employment records that specifically indicate that an individual has a mental or physical impairment that substantially limits a major life activity. *Reis v. Universal City Development Partners, Ltd.,* 442 F.Supp. 2d 1238, 1248-49 (M.D. Fla. 2006). It is undisputed that Daniel Wolfe had a medical condition, i.e. asthma; however, there is no evidence to support that Wolfe's records identified his impairment as one that "substantially limited" a major life activity as defined by the ADA; or any records that indicate Daniel Wolfe was being regarded as having such an impairment. As such, this argument will focus on whether Wolfe actually had a physical or mental impairment that substantially limited one or more of his major life activities as required to be classified as disabled under Title 42 U.S.C. § 12102(2).

In determining whether an individual has a disability, courts use a three step assessment: "(1) does the plaintiff have an impairment; (2) does the relied-upon life activity qualify as a major life activity; and (3) does the impairment substantially limit the major life activity." *Wofsy v. Palmshores Retirement Community,* 285 Fed.Appx. 631, 632 (11th Cir. 2008). "Merely having an impairment does not make one disabled for purposes of the ADA.... Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Manufacturing Kentucky Inc. v. Williams,* 122 S.Ct. 681, 690 (2002); *Brown v. Chatman* (M.D. Ga. 2010). Furthermore, the claimant must show that the impairment on the major life activity is substantial. *Id.*

8

"Major life activities are those functions that the average person can perform with little or no difficulty, such as walking, hearing, speaking, breathing, and working." *Brown v. Chatman,* 2010 WL 3717283 at 4 (M.D. Ga. 2010). Additionally, "[t]he Supreme Court has stated that the term 'major life activities' refers to those activities that are of central importance to most people's daily lives." *Wofsy v. Palmshores Retirement Community,* 285 Fed.Appx. 631, 632 (11th Cir. 2008) (*quoting Toyota Motor Manufacturing Kentucky Inc.*, 122 S.Ct. at 690. The Court in *Toyota* went on to explain that the terms substantial impairment and major life activity needed to be strictly construed "so as to create '**a demanding standard for qualifying as disabled**.'" *Toyota Motor Manufacturing Kentucky Inc.*, 122 S.Ct. at 691 (emphasis added).

The claimant must affirmatively prove that his impairment "substantially limits" a major life activity. *Brown v. Chatman,* 2010 WL 3717283 at 4 (M.D. Ga. 2010). The ADA does not specifically define "substantial impairment." For this reason, courts have looked to other sources, including the Equal Employment Opportunity Commission.

> According to the EEOC regulations, "substantially limit[ed]" means "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Toyota Motor Manufacturing Kentucky Inc.*, 122 S.Ct. at 690. The following factors should be considered in determining if one is substantially limited in a major life activity: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Id.* The language "substantially limits" requires that a person be

"presently-not potentially or hypothetically-substantially limited" in order to qualify as disabled. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2146-47 (1999).

    In evaluating the degree of limitation caused by an impairment, it is appropriate under the ADA to take into consideration mitigating measures taken by the individual when the impairment is "largely corrected by medication or other devices." *Id.* at 486; *Wofsy v. Palm Shores Retirement Community,* 2008 WL 151892 at 7 (M.D. Fla. 2008). **"A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."** *Id.* at 482 (emphasis added). **"[A]sthma and similar conditions which are episodic in nature and can be treated or controlled with readily available medication generally do not constitute 'disabilities' as defined under the ADA."** *Wofsy,* 2008 WL 151892 at 7 (emphasis added).[6]

    In a matter similar to the instant case, the question of whether a physical impairment substantially limited a major life activity was addressed by the Supreme Court of Vermont in *Charbonneau v. Gorczyk,* 176 Vt. 140, 838 A.2d. 117 (2003).[7] An inmate brought suit under Title II of the ADA against Vermont's Department of Corrections, claiming that he was discriminated on the basis of his disability. *Id.* at 142. The inmate suffered from Prinz-Metil angia, a physical impairment described by the court as:

---

[6] *See also Ventura v. City of Independence,* 1997 WL 94688 (6th Cir. 1997) (holding employee failed to demonstrate his asthma was a disability under the ADA where employee was able to perform a wide range of activities and hold several different types of jobs); *see also White v. Honda of America Mfg., Inc.,* 241 F.Supp. 2d 852, 856-57 (S.D. Ohio 2003) (noting that "[n]umerous courts have found that individuals who are able to treat their asthma such that they are able to engage normally in physical exertion without symptoms are not substantially limited in any major life activity," and holding employee's episodic asthma was not an impairment that limited the major life activity of breathing where she could perform normal life activities like driving, pumping gas, walking, exercising, smoking, and going to restaurants); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 486, 119 S.Ct. 2139, 144 L.Ed. 2d 450 (1999) (concluding that Congress did not intend for those whose impairments "are largely corrected by medication or other devices" to be considered "disabled" within the meaning of the ADA.).

[7] The Second Circuit acknowledged the Vermont state court was "more than capable of addressing ...CLAIMS UNDER THE American's with Disabilities Act...." McGrix v. Vermont, 452 Fed. Appx. 74 (2nd Cir. 2011).

> a heart condition that causes intermittent, involuntary spasms of the coronary artery, restricting blood flow to the heart. The **spasms are unpredictable** and ... [p]eople with this condition **can suffer spasms even at rest**. When these spasms occur, plaintiff experiences acute pain, and he **must take three nitroglycerin tablets over a fifteen minute period**. If the pain persists despite the medication, more intensive medical intervention is necessary to diagnose the potential for a heart attack. **Timely medical care following a spasm is essential** to successfully monitor and manage plaintiffs condition. ... Failure to diagnose and treat within two hours of the spasm could result in a heart attack. Accordingly, as the trial court here found, "**proximity to, and availability of 24-hour EKG capability is critical** to successful monitoring, and management of [plaintiffs condition].

*Id.* at 142, 145 (emphasis added).  As there was no dispute as to whether the inmate/plaintiff suffered from a physical impairment, the court turned to the issue of whether the inmate's impairment substantially limited a major life activity. *Id.* at 142.  In conducting its evaluation, the court noted that while "most individuals who suffer from Prinz-Metil angina must live in an area where they have access to medical care, many can live and work in the community with few, if any, residence, travel, or work restrictions." *Id.* at 141.  The court then discussed the inmates **sixteen** (16) Prinz-Metil angina episodes that he experienced while incarcarreted, which included at least one trip to the hospital.  While the court clearly acknowledged the inmates history of episodic attacks, the primary analysis focused on the inmates daily activities while incarcerated.  The Court determined that the inmates "condition had not affected any of his day-to-day activities, nor his ability to perform laundry and janitorial jobs at the prison." *Id.* at 143.  Accordingly, the inmate's physical impairment did not substantially limit a major life activity, and the court found him not to be "disabled" under the ADA. *Id.* at 145.

In the matter presently before the Court, the Plaintiff's claim is premised on the assertion that Wolfe's asthma substantially impaired his ability to breath, a major life activity.  However, the evidence in this case suggests differently: that Daniel Wolfe's ability to breathe

11

was not *substantially* impaired. Prior to his incarceration, but after he was diagnosed with asthma, Wolfe worked various jobs, which included air-conditioning repair, automotive care, car washing, and construction work. (D.E. 51-2, p. 28:13-21.) Additionally, he assisted his mother with vacuuming, painting, doing the dishes, and fixing electronics. (*Id.*, p. 35.) His asthma did not restrict his ability to perform those functions, nor inhibit him from committing, *inter alia*, armed burglary of an occupied dwelling; grand theft; and grand theft of a motor vehicle. (*See* D.E. 51-1.) Both prior to his incarceration as well as during his incarceration, Wolfe regularly engaged in activities that are known to enhance breathing patterns, such as basketball and football. (D.E. 51-2, p. 13:7-11.) Wolfe also engaged in risk enhancing activities, such as smoking cigarettes and marijuana while incarcerated. (D.E. 51-12, p. 50:8-14, 51:18-21, 52:15-18; D.E. 51-18; D.E. 51-19.) Clearly, Wolfe's asthma, like the inmate's Prinz-Metil angina in *Charbonneau*, did not substantially limit his ability to breathe on a day-to-day basis, as he was able to play basketball and football, work various jobs ranging from air-conditioning and automotive repair to construction work, and smoke cigarettes.

In light of the aforementioned, this Honorable Court should find that Daniel Wolfe was not substantially limited in any major life activity as required in order to qualify as disabled under Title II of the Americans with Disabilities Acts, and that the Defendant is entitled to judgment as a matter of law.

## IV.   THE PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE DEPARTMENT VIOLATED TITLE II OF THE ADA, NOR THAT HE IS ENTITLED TO THE MONETARY RELIEF SOUGHT

The Amended Complaint alleges, *inter alia*, that the Department of Corrections intentionally discriminated against Wolfe by failing to provide him reasonable accommodations,

as well as failing to train their employees. (D.E. 5, ¶¶ 51-62, 63-74.)   42 U.S.C. § 12132 provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

To establish such a claim, the Plaintiff must demonstrate that Wolfe was (1) a qualified individual with a disability; (2) that he was either excluded from or otherwise denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was a result of his disability. *United States v. Georgia*, 546 U.S. 151, 153 (2005); 42 U.S.C. § 12132.

For the Plaintiff to maintain the cause of action under Title II, the individual in question must initially meet the requirements of a qualified individual under 42 U.S.C. § 12131(2), part of which was respectively analyzed earlier in this motion. Accordingly, the arguments set forth in this section and the next sections are presented as alternative arguments in case this Honorable Court determines that Wolfe was disabled.

## A. ADA in the Prison Context

The Eleventh Amendment affords the states immunity from "any suit in law or equity, commenced or prosecuted ... by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. However, a State's immunity from a private right of action from an individual "may be lifted if: (1) a state waives its immunity; or (2) such immunity is abrogated by an act of Congress." *Mohney v. Pennsylvania*, 809 F.Supp. 2d 384, 393 (citing U.S.C.A. Const. amend. XI); *see also Georgia*, 546 U.S. at 159. As Florida has not waived its

immunity to claims under the ADA, liability may only attach to the State upon finding that the Statute's immunity has been abrogated.

"Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Tennessee v. Lane*, 541 U.S. 509, 518, 124 S.Ct. 1978, 158 L.Ed. 2d 820 (2004). "Although Congressional authority under § 5 is broad, it is not unlimited." *Bowers v. National*, 475 F.3d 524, 551 (3rd Cir. 2007) (*citing Lane*, 541 U.S. at 520, 124 S.Ct. 1978). The key limitation is that Congressional action must not work "a substantial change in the governing law." *City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157. In this respect, the Supreme Court has established a "congruence and proportionality" test, and held that "Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Lane*, 541 U.S. at 520, 124 S.Ct. 1978 (*quoting City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157). The Court has enacted a three-step inquiry to determine whether a particular statute satisfies the congruence and proportionality test, which requires the parties to identify: (1) with some precision the constitutional right at issue; (2) whether Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled; and (3) whether the rights and remedies created by the statute are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress. *Garrett*, 531 U.S. at 365, 368, 372-73.

The Defendant acknowledges that insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates a constitution right, Title II validly abrogates state sovereign immunity. *Georgia*, 546 U.S. at 159 (holding that the sovereign was not immune to the Plaintiff's claims under Title II for conduct that violated his Fourteenth

14

Amendment rights). The Court left unanswered the question of whether an individual could maintain a private cause of action for money damages against a State under Title II of the ADA when the alleged conduct violated the ADA, but not a constitutional right. *Id.* In evaluating same, lower courts have been directed to (1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such misconduct also violated a provision of the Constitution; and (3) insofar as such misconduct violated Title II but did not violate a constitutional provision, determine whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Bowers*, 475 F.3d at 532 (*analyzing United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006)).

The Plaintiff has simply failed to identify what constitutional provision was violated as a result of the Department's conduct. As such, if the Court should determine that any of the Department's alleged conduct violated Title II of the ADA, then it must be determined that Congress's abrogation of the State's sovereign immunity as to such conduct is valid. Absent such a finding, the Plaintiff's claims for money damages must fail, and the Defendant in entitled to judgment as a matter of law as to the issue of monetary damages under Cout II and Count III of the Plaintiff's First Amended Complaint..

### B. The Plaintiff Has Failed to Demonstrate that the Department of Corrections was Deliberately Indifferent to Providing Reasonable Accommodations to Daniel Wolfe.

The focal point of the Plaintiff's claim that the Department was *deliberately indifferent* as to providing Wolfe a reasonable accommodation centers on a modification to his housing assignment based on his medical condition. Specifically, the Plaintiff claims that Wolfe should have been "placed in a dorm or cell where he could get help **immediately** if he had an asthma

attack, and/or that he be transferred for the same purpose." (D.E. 51-15) (emphasis added).[8] The Plaintiff's expert's that Wolfe, based on the severity of his medical condition, should have been housed permanently in an infirmary setting or been provided an emergency call device allowing instant notification of a medical emergency. (D.E. 51-5, p. 67.) As it is undisputed that Wolfe was not totally deprived of medical care,[9] and that the conflict at issue relates expressly to the timely provision such care, the Plaintiff is in essence is claiming that the Department was deliberately indifferent as to the adequacy of Wolfe's medical care. *Id.*

To prove deliberate indifference, the prisoner must show that the defendant prison official " 'acted with a sufficiently culpable state of mind' " with regard to the serious prison condition or serious medical need in issue. *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) opinion vacated and superseded, 449 F.3d 1149 (11th Cir. 2006) (quoting *Chandler*, 379 F.3d at 1289-90 (quoting *Hudson*, 503 U.S. at 8, 112 S.Ct. at 999). Negligence or even gross negligence does not satisfy this standard. *Id.; Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir.1996).

Decisions governing the housing, transfer, and provision of services to inmates in the penitentiary setting take into account a broad spectrum of concerns unique to the correctional system. The fundamental nature of the penological system requires that security concerns are implicit in every decision made, which includes decisions addressing the provision of housing modifications for impaired inmates. *Charbonneau*, 176 Vt. at 150. While evaluating the reasonableness of measures employed to protect prisoners from discrimination based on a physical impairment, courts must acknowledge the concerns of prison administration; "a key consideration must be whether the inmate's claim implicates prison security or institutional

---

[8] Lynn Wolfe did not have an answer when asked whether placing Daniel Wolfe in different unit that ensured a five minute or less response time would have been a reasonable accommodation.

[9] Wolfe's receipt of prescription medication, enrollment in the Department's Respiratory Clinic, and the treatment records from each and every claimed asthma related emergency demonstrate that Wolfe received regular medical care.

16

order. *Id.* (Johnson, J., dissenting, acknowledges the need for due consideration given to prison administration's security concerns); *see, e.g., Pitts v. Thornburgh*, 866 F.2d 1450, 1453-54 (D.C. Cir. 1989) (prisoner claims that implicate "general budgetary and policy choices" rather than security concerns do not require same level of administrative deference). The Constitution and other laws of the United States extend great respect and deference to the judgment of prison administrators. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2401 (1987). The "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *Id.* at 349 (*quoting Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).

In the years leading up to Wolfe's passing, the Florida Department of Corrections had developed and implemented numerous procedures and policies focused on identification of impaired inmates requiring accommodations, and the provision of services/modifications in a manner that ensures for the safety of inmates, staff and the general public. (*See e.g.* Procedure 604.101 (7-1-2002), Bates # 3878 – 3892; Technical Instruction No. 15.03.25 (3-7-2001), Bates # 3319 – 3326); Technical Instruction 15.03.13 (2-4-2004); Bates Technical Instruction 15.03.13 (2-4-2004); Bates 3540–3545.)

The Department has recognized the need to have the inmate's impairments and/or disabilities addressed immediately upon intake into the Department's system. Per its guidelines, the Department's physicians were tasked with diagnosing and evaluating inmates' medical conditions or physical conditions, and determining the need for services. (Procedure 604.101 at Bates #3882); D.E. 51-10, p. 27:6-14.) Identification of disabilities that affect inmate placement usually occurred during reception center processing. (D.E. 51-10, p. 25:13–26:2.) The early evaluation also ensured that inmates being transferred out of the reception centers were going to

facilities that could accommodate their various needs. However, the referral process is available throughout the inmate's incarceration – not just at intake. (*Id.*, p. 117.)

As structured, the policies ensured each inmate's condition was evaluated and treated on an individual basis, which protected inmates with mild conditions from being inappropriately labeled as "disabled," and potentially isolated in an infirmary setting away from the general population, or restricted from work programs that would allow them to earn reductions in their sentences. *See* T.I. 15.03.13(2-4-2004). Per the Department's guidelines, inmates were not to be housed in the infirmary unless it was for "required medical care" and the housing decision was to be made by the institution's Chief Health Officer. (*See* Sullivan's Report p. 3). Absent a finding by the Chief Health Officer that an inmate required a modification of placement for the purpose of treatment and care, or other similar finding of a need for modification, the inmate's security classification was generally the decisive factor in deciding an inmate's housing assignment – in accord with the Department's fundamental purpose.

Upon arrival at South Florida Reception Center, Daniel Wolfe was evaluated and received a security classification, medical grade, mental health grade and a work grade. (D.E. 51-16). Provision of accommodations for Wolfe were made by trained, competent medical professionals. (D.E. 51-10, p. 17.) While he was never identified as having an impairment that significantly impaired a major life function, Wolfe was enrolled in the Department's *Respiratory Clinic*. The *Respiratory Clinic* was designed to encourage the control of inmates' respiratory conditions, and the prevention of complications, and is one of ten different Chronic Illness

Clinics ("CICs") that were regularly implemented by the Department.[10]   (T.I. 15.03.05 App. 1, Bates # 3317–3318.)

As a result of Wolfe's inclusion in the *Respiratory Clinic*, he was evaluated by Lake C.I.'s physicians at regular intervals, during which the physicans established a baseline history with an examination that included an assessment of risk factors for asthma patients. *Id.* Also, an X-ray of Wolfe's chest was performed, and his regular peak flow measurmnets were recorded.[11] (*C.f.* D.E. 51-17)   Based on the examination results, appropriate variations to Wolfe's medications regiment could be implemented.   As a component of the *Respiratory Clinic* program, Wolfe received education   regarding the treatment compliance and risk factor reduction. *Id.*   In addition to *Respiratory Clinic* examinations, Wolfe was issued a medical pass to keep multiple asthma medications on his person 24 hours a day (KOP).   (D.E. 51-10, p. 41). All of the accommodations, services and programs were provided to Wolfe while he was housed in a dormitory at Lake C.I. designed for the purposes of housing inmates posing an enhanced security risk, like Wolfe.

The quantum of treatement records and testimony in this matter demonstrate that the Department provided reasonable, effective medical care to Wolfe leading up to the date of his death.   (D.E. 51-5, p. 62:19-22.)   As the Chief Health Officer's review of Wolfe's need, or lack thereof, for permenant transfer to an infirmary setting or the provision of emergency medical devices was a component of such care, the Plaintiff has failed to demonstrate that the Department's agents acted with the necessary culpable state of mind.   Even if it is determined the Plaintiff has proven that the Department's medical treatment was inadequate, such a claim fails

---

[10] T.I. 15.03.05 established ten Chronic Ilness Clinics (CICs), which addressed following categories of conditions: Respiratoy, Endocrine, Miscellaneous, Cardiovascular, Tuberculosis, Immunity, Neurology, Gastrointestinal, Oncology, Renal.

[11] Peak flow measurements are utilized in relation to asthmatics to measure airway obstruction and muscle strength. A poor peak flow reading can be an early indicator of potential asthma attack.

under the ADA. *See e.g. Cavalieri v. Las Vegas Metropolitan Police Dept.* (D.Nev. 3-13-2012) (supporting the proposition that the ADA prohibits discrimination because of disability, not inadequate treatment for disability) (internal citations omitted); *c.f. Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)). A prison that simply failed to attend to the medical needs of its disabled prisoners would not have violated the ADA, as the statute did not create a remedy for medical malpractice. *See Schindler v. Schiavo*, 403 F.3d 1289 (11th Cir. 2005); *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (inmate's claims under Rehab Act and ADA were properly dismissed for failure to state claim as they were based on medical treatment decisions); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

In sum, the Plaintiff has failed to demonstrate that the Department failed to make reasonable accomodations (special clinics, medication being kept on person, etc.) for the Defendant; or that the Department's agents were aware that the Plaintiff suffered from such a severe medical condition that he was reasonably at risk of serious harm, and culpably disregarded such risk. As such, the Defendant is entitled to Summary Judgment as a matter of law as to Count III of the Plaintiff's First Amended Complaint.

## C. The Plaintiff has Failed to Demonstrate that the Department of Corrections

### Did Not Provided Reasonable and Effective Training.

The Plaintiff has failed to demonstrate that Wolfe's passing was a result of the Department failing to adequately train its employees. Generally, to support a "failure to train" cause of action, the Plaintiff must identify a patern of similar harms caused by the Defendant's failure to train. *See Mohney v. Pennsylvania*, 809 F.Supp. 2d 384, 391 (W.D. Pa. 2011) (To maintain such an action the Supreme Court has explained that "[a] pattern of similar

20

constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.") (*citing Connick v. Thompson,* 131 S.Ct. 1350, 1360, 179 L.Ed. 2d 417 (2011)); *see e.g. Craig v. Floyd County, Ga.,* 643 F.3d 1306, 1310 (11th Cir. 2011); *City of Okla. City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed. 2d 791 (1985) (holding "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality in a 1983 claim for deliberate indifference) (plurality opinion); *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir.1991) (holding "[a] single incident would not be so pervasive as to be a custom," ... because a custom must be such "a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it[.]"). The Plaintiff has failed to demonstrate such a pattern. Rather, the record evidence reflects that the Department established reasonable training protocols, and successfully implemented same.

The training of the Florida Department of Corrections' officers, medical personnel, administratrators and staff in the field of corrections was designed to meet the mission of the Department – to protect the public by operating a safe, secure, humane and efficient corrections system.[12] (*See FDOC Master Training Plan 2005-2006*).[13] Protection of the public, staff and inmates are of utmost importance. *Id.* The protections afforded to inmates are not only from physical harms, but from disclosure of personal information of a sensitive nature, as well as taking reasonable measures to inform inmates of their rights. (D.E. 51-10, p. 20:12-21; D.E. 51-8, p. 40:10-21)

---

[12] As the training policies and procedures have evolved throughout the years, the arguments contained in this section are based on those manuels and procedures in place in the years leading up to the date of Daniel Wolfe's death.
[13] Training Policies and Procedures cited in this section will be filed under seal, upon the Court's approval, for the Court's review as soon as practicable.

At all times relevant hereto, "[t]he Bureau of Staff Development was responsible for the management and coordination of departmental training." (*FDOC Master Training Plain*, at 3.) In furtherance of the Department's development, the Bureau of Staff Development monitored, amongst other things, "regulatory authority training requirements including department policies, state and federal rules and statutes as well as organizational mandates from the American Correctional Association (ACA) and Criminal Justice Standards and Training Commission (CJSTC) to ensure compliance."[14] (*Id.* at 2.) Based on their review of same, as well as their own internal assessments, the Bureau annually issues its Master Training Plan ("MTP"), which is designed to "support[] the Department's mission by focusing on mission critical training that insures the health and safety of department employees as well as the inmates/offenders" in its custody. (*Id.*) The MTP consists of three primary categories of training materials, which are: (1) Pre-Service Orientation, and Basic Recuit Training; (2) inservice and mandatory training; and (3) advanced and specialized training. While going through the Correctional Officer Basic Recruit Academy, new Correctional Officers are put through an intensive curriculum at the Correctional Officer Basic Recruit Academy, which was comprised of approximately 532 hours of training; and included the forty-hour First Aid for Correctional Officers course. (*Id.* at 30-32.) Additionally, all of the Department's employees coming into contact daily with inmates have an annual requirement of 40 additional hours of training. ( *Id.*)

While the 40 hour requirement was the minimum, officers often exceeded that requirement. Two examples of such exceptional dedication to training are the two officers that responded to Daniel Wolfe's cell on the evening of August 3, 2006, Sgt. Taylor and Sgt.

---

[14] The ACA conducts "the only national accreditation program for all components of adult and juvenile corrections programs." Upon completion of the audit, Lake C.I. was determined to be 100% compliant with the ACA's mandatory standards, and 97.9% compliant with the Non-Mandatory standards set forth in the ACA's Manual.

Ackerman. As reflected in his training records, Sgt. Ackerman completed 97 hours of training in the eight months prior to Daniel Wolfe's death, with five hours dedicated to CPR and the administration of basic first aid. During that same time period, Sgt. Taylor completed 108 hours of annual training, which also included the CPR and basic first aid courses. In addition to the two officers that first responded to Wolfe's cell on August 3, 2006, a Licensed Practical Nurse working at Lake C.I. responded. The LPN was not only licensed by the Florida Department of Health, but had held her instructor's license for first responders CPR through the American Red Cross for approximately eleven years prior to the date of the incident.

The Department developed training policies and procedures in accordance with the generally accepted standards for the Correctional field. It trained its employees. The Plaintiff has failed to demonstrate that such training was not reasonable in scope or duration. There is no record evidence to demonstrate that Daniel Wolfe's death was a result of the Department's employees not being appropriately trained. Accordingly, the Defendant is entitled to Summary Judgment as a matter of law as to Count III of the Plaintiff's First Amended Complaint.

## VI.    CONCLUSION

As demonstrated above, Plaintiff cannot prove the essential element of the claim brought pursuant to the Americans with Disabilities Act. In contrast, the Florida Department of Corrections fulfilled all of its legal obligations and responsibilities under the ADA and is entitled to judgment as a matter of law. Therefore, Defendant respectfully requests this Court to enter an Order granting its Motion for Summary Judgment and directing the Clerk to enter judgment for Defendant and against the Plaintiff with respect to Counts II and III of the Plaintiff's First Amended Complaint.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided via

U.S. Mail to Shawn A. Heller, Esq., Florida Justice Institute, Inc., 100 S.E. 2nd Street, 3750

Miami Tower, Miami, Florida 33131-2309 this __11_ day of June, 2012.

**MANDELBAUM, FITZSIMMONS & HEWITT, P.A.**

/s/ Samuel R. Mandelbaum

_____

**SAMUEL R. MANDELBAUM, ESQ. #270806**
**SRM@MANFITZLAW.COM**
**SCOTT K. HEWITT, ESQ. #164836**
**SKH@MANFITZLAW.COM**
**STEPHEN A. SPAID, ESQ. #0085432**
**SAS@MANFITZLAW.COM**
Post Office Box 3373
Tampa, Florida 33601
Telephone: (813) 221-0200
Facsimile: (813) 221-8558