### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

LYNN WOLFE, as Personal Representative of
the ESTATE OF DANIEL WOLFE, on behalf
of the Estate, and on behalf of Daniel Wolfe's
Survivor, LYNN WOLFE,

       Plaintiff,

vs.                                 Case No.: 5:10-cv-663-Oc-PRL

FLORIDA DEPARTMENT OF
CORRECTIONS,

       Defendant.
_____/

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II AND III

Plaintiff, by and through undersigned counsel, hereby responds to Defendant's Motion for

Summary Judgment as to Counts II and III of Plaintiff's First Amended Complaint [DE 52]

("Motion").  Lynn Wolfe, Daniel Wolfe's mother and the Personal Representative of his estate,

brings this case to redress the death of her son at the hands of Defendant, the Florida Department

of Corrections ("FDOC").  Despite having knowledge of Daniel's severe and debilitating asthma,

Defendant did nothing to accommodate it.  As a result, Daniel died gasping for air in his cell, with

six months left on his sentence and just shy of his 25th birthday.  All of the arguments raised in

Defendant's Motion are meritless, the Motion should be denied in all respects, and this matter

should proceed to a jury trial.

## I.      Statement of Material Undisputed Facts[1]

Defendant's "Statement of Undisputed Facts" is actually replete with both disputed and

immaterial facts, and is missing facts, both disputed and otherwise, that are crucial to the

---

[1] A list of exhibits in order of appearance, and in alphabetical order is attached hereto as Exhibit 1.

determination of this case.  The FDOC goes to great lengths to characterize Daniel as "an active young man," repeatedly referring to any singular instance where Daniel was able to sing, draw, or exercise as evidence that his severe asthma did not substantially limit his everyday activities.  *See* Motion at 2, 4, 12.  In reality, Daniel suffered from a chronic and severe form of asthma which substantially affected nearly every aspect of his daily life.

First diagnosed with asthma at age five, Daniel's life was immediately limited by it.  Wolfe Dep. 63:8-9.  As a young child, Daniel was unable to engage in numerous physical activities, such as swimming and running, due to limitations that asthma placed on his breathing.  Wolfe Decl. ¶ 5.  Daniel could only spend a limited amount of time outdoors, as the heat made it difficult to breathe, and allergies to thirty-three separate things (including grass, pollen, and certain animals) exacerbated his asthma symptoms.  Wolfe Decl. ¶ 6; Wolfe Dep. 66:3-15; Vazquez Decl.[2, 3]  Although Daniel received constant treatment for his condition, and used an asthma inhaler daily, Daniel's chronic asthma still presented a constant and dangerous problem, resulting in several emergency trips to the hospital.  Wolfe Dep. 63:14-19, 67:15-21.  On numerous occasions as a child, Daniel had to wake his mother up in the middle of the night because he couldn't breathe.  Wolfe Dep. 92:22 – 93:24.

These asthma attacks – as well as the disease's impact on Daniel's daily life – became even more pronounced during Daniel's incarceration.[4]  As noted by the Defendant, the FDOC was well aware of both the severity and chronicity of Daniel's asthma.  *See* Motion at 3.  When Daniel was first received by the FDOC, Defendant noted that Daniel had a history of asthma requiring hospitalization since the age of five, that his last hospitalization for an asthma attack was only a year prior, and that he required daily use of an inhaler.  Initial Intake Screening at 1, 2.  FDOC diagnosed

---

[2] Dr. Samuel Vazquez performed two allergy skin tests on Daniel in 1997.  The Results were faxed to Lynn Wolfe, and printed on thermal paper.  The print has become faint, and cannot be scanned or copied, but can, however, be read.  Dr. Vazquez was able to read the results, and has attested to their authenticity.
[3] Results with a 2 or higher indicate an allergic reaction, and the number of +'s indicates the severity of the reaction.
[4] Wolfe Decl. ¶ 7; A. Rivera Decl.-2 ¶¶ 7-13; Berrios Decl.-2 ¶¶ 3-5; Cotto Decl.-2 ¶¶ 3-6; L. Rivera Decl.-2 ¶¶ 3-7.

Daniel with chronic asthma, enrolled him in the FDOC's Chronic Illness Clinic, and allowed Daniel to carry his asthma inhaler with him at all times for daily use as needed, which would otherwise be prohibited by FDOC rules.[5]  *Id.* at 1, 3; Motion at 3.

Despite Daniel's daily medication and regular treatment, Daniel continued to struggle with his asthma on a daily basis while incarcerated, and the number of his severe asthma attacks increased.   Record of Asthma Emergencies; Wolfe Decl. ¶ 7; A. Rivera Decl.-2 ¶¶ 7-13; Berrios Decl.-2 ¶¶ 3-5; Cotto Decl.-2 ¶¶ 3-6; L. Rivera Decl.-2 ¶¶ 3-7.   In fact, Daniel had seventeen separate asthma-related emergencies—not simply asthma attacks—during his incarceration.  *See* Record of Asthma Emergencies. In the two years prior to his arrival at Lake Correctional Institution ("Lake C.I."), Daniel suffered at least three documented asthma emergencies, which required either hospitalization, overnight stays in the prison infirmary, or advanced medical care.   Record of Asthma Emergencies at 1-8.  After one such emergency on June 8, 2003, Daniel was placed in the prison infirmary for extended observation after suffering an asthma attack which did not subside after the use of his inhaler.  Record of Asthma Emergencies at 4-7.  The FDOC kept Daniel in the infirmary overnight, and treated him with multiple medications.  *Id.*  In addition to his Albuterol rescue inhaler, Daniel regularly took the inhaled corticosteroid QVAR,[6] was consistently enrolled in the respiratory clinic,[7] and required very frequent nebulizer treatments.[8]

On November 1, 2004, Daniel was transferred to Lake C.I.  Motion at 3.  While at Lake, Daniel was similarly limited in his daily activities as a result of his chronic and severe asthma.[9]  He had trouble breathing on a daily basis, and was forced to use his inhaler several times a day, and he

---

[5] The notation "INHALER KOP" indicates that Daniel was permitted to keep his inhaler with him at all times.  KOP stands for "Keep on Person."  Initial Intake Screening at 1.

[6] Hendeles Dep. 75:22-25, 76:1-16; Ledford Dep. 40-55:1-21, 56:3-4, 18-20, 58:12-25, 59-60:1-20, 61:17-21, 62:7-15.

[7] Respiratory Treatment Records at 27, 30, 34, 35; Record of Asthma Emergencies.

[8] Respiratory Treatment Records at 7, 17, 23, 27, 30, 34, 35.

[9] A. Rivera Decl.-2 ¶¶ 7-13; Berrios Decl.-2 ¶¶ 3-5; Cotto Decl.-2 ¶¶ 3-6; L. Rivera Decl.-2 ¶¶ 3-7.

always carried it.[10]  Constantly fearful of another attack, Daniel rarely went outside, and was unable to play sports or exercise for any significant period of time without exacerbating his asthma. Thompson Dep. 15:4-25; A. Rivera Decl.-2 ¶¶ 7-9; L. Rivera Decl.-2 ¶ 4.  Attempts at running or playing softball ended in labored breathing or full-fledged asthma attacks.  A. Rivera Decl.-2 ¶ 9; L. Rivera Decl.-2 ¶ 4.  Daily walks around the compound resulted in difficulty breathing or trips to the infirmary.  Berrios Decl.-2 ¶ 4; Thompson Dep. 15:4-25.  Unable to work outside due to the heat and exposure to allergens, Daniel could not participate in lawn duty.  A. Rivera Decl.-2 ¶ 11; L. Rivera Decl.-2 ¶ 6.  Daniel was also unable to work in the kitchen due to the effects of the heat and cleaning chemicals on his breathing.  *Id.*  Even when Daniel did stay inside, his asthma was a constant presence; singing was difficult, and asthma attacks occurred while Daniel was laughing, horseplaying, or just sitting in his cell.  Berrios Decl.-2 ¶ 5; Cotto Decl.-2 ¶ 5; L. Rivera Decl.-2 ¶¶ 5-7; Cotto Dep. 17:13-18.

Despite these limitations and Daniel's recorded history of asthma-related emergencies and hospitalizations, the FDOC housed Daniel in E-Dorm at Lake C.I., where he was not continuously supervised, and where he did not have any way to alert correctional or medical staff in case of an asthma emergency.  Ackerman Dep. 25:12-25; 26:1-2.  In E-Dorm, correctional officers sit in a glass-enclosed officers' station behind a double set of metal doors, and typically conduct security rounds every seventy-five to ninety minutes.[11]  E-Dorm provided corrections officers with no way to observe Daniel without first leaving the building, reentering through another set of doors, going through yet another set of doors, and climbing stairs.  Ackerman Dep. 35:11-24; 38:23-25; 39:1-10; McAndrew Decl. ¶ 14.  The inmates in E-Dorm have no approved method to alert correctional or medical staff of an emergency in between these rounds, and there are no defibrillators, oxygen

---

[10] A. Rivera Decl.-2 ¶ 5; Berrios Decl.-2 ¶ 3; Cotto Decl.-2 ¶ 3; L. Rivera Decl.-2 ¶ 3; Kitt Decl.-2 ¶ 5; Kitt Dep. 9:25; 10:1-2; Thompson Dep. 15:4-25.
[11] Kitt Decl.-1 ¶ 5; Berrios Dep. 24:14-17; Cotto Decl.-1 ¶¶ 4, 7; Cotto Dep. 47:20; A. Rivera Dep. 21:25.

canisters, or nebulizer machines in E-Dorm in the event an asthma emergency does occur.[12]   The only way inmates in E-Dorm attempt to contact correctional staff during an emergency is to bang on the cell doors and yell,[13] both of which subject the inmates to discipline, which can result in the use of force against those inmates, loss of gain time, and being placed in solitary confinement. Harris Dep. 36:17-37:12, 47:9-15; Rhoden Dep. 24:11-25:6.

On November 26, 2004, while in E-Dorm, Daniel began to experience symptoms of respiratory distress while sleeping.  Cunningham Decl. ¶ 4; Smith Decl. ¶ 4.  His inhaler did not help *Id.*  Daniel's roommate attempted to alert correctional staff of Daniel's emergency by yelling for help, but no staff responded.  *Id.*  Daniel's roommate began yelling at the other inmates in E-Dorm to wake up and help to get the attention of correctional staff.  *Id.*  Several other inmates in E-Dorm began yelling and kicking and banging on their doors, but still no staff responded.  *Id.*

After roughly ten to twenty minutes had passed, a guard finally arrived at Daniel's cell, and, later, a nurse.  Cunningham Decl. ¶ 5; Smith Decl. ¶ 6.  At that point, Daniel was unconscious, his vital signs were nonexistent, and he had turned blue.  Record of Asthma Emergencies at 11; Harmon-Palaile Decl. ¶ 9.  Medical staff attempted to perform CPR, but Daniel did not respond.  *Id.* Finally, paramedics arrived and transported Daniel to the hospital, where he was revived.  Record of Asthma Emergencies at 11-14.  After a period of observation in the hospital, Daniel was returned to Lake C.I., where he was placed in the infirmary for several days for observation and treatment.  *Id.*

Despite Daniel's brush with death, after his release from the infirmary the FDOC placed Daniel back into E-Dorm.  Wolfe Dep. 114:4-6.  Daniel and his mother were terrified that he would suffer another asthma attack and that he would again be unable to alert any correctional or medical staff of an emergency.  Wolfe Decl. ¶ 9.  On at least four separate occasions, Daniel's mother

---

[12] Ackerman Dep. at 25:12-25, 26:1-2; R. Taylor Dep. 24:6-7, 65:14-15, 65:25, 66:1; Aydur Dep. 36:5-11, 70:6-10; Berrios Dep. 51:19-25, 52:1-15; Cotto Dep. 70:18-25, 71:1-9; Kitt Dep. 20:9-17; A. Rivera Dep. 12:11-25, 13:1-25, 14:1-2.
[13] Smith Decl. ¶ 5; Berrios Dep. 20:21-25, 21:1-12; A. Rivera Dep. 11:12-21, 23:20-23, 28:2-25, 29:1-9; Cotto Dep. 29:12-14, 31:3-25, 32:1-13; Berrios Dep. 20:23-25, 21:1-12.

contacted staff at Lake C.I. to request that Daniel be moved to a dorm where he could immediately alert staff in case of an emergency. Wolfe Dep. 144:9-25, 145:1-25; Pl. Resp. to Interrogs. at 10. Daniel also made similar requests. Wolfe Decl. ¶ 8. Despite their pleas, Daniel was not moved. Aydur Dep. 114:18-19; 126:9-12; Wolfe Dep. 114:4-6.

Instead, Daniel suffered six more documented emergencies due to severe asthma attacks over the next year while housed in E-Dorm, each of which required either hospitalization, overnight stays in the prison infirmary, or advanced medical care. Record of Asthma Emergencies at 8-32. Many of these occurred when Daniel was sleeping. *Id.* As before, Daniel was kept in the infirmary for several days for observation and treatment, and then returned to E-Dorm. *Id.* Despite this record, and despite Daniel and his mother's repeated requests to be moved to a dorm where he could alert staff in case of an emergency, the FDOC never even considered safer, alternative housing for Daniel as an accommodation for his disability. Aydur Dep. 123:10-23, 124:19-25, 125:15-22.

On August 3, 2006, Daniel suffered his final asthma emergency in the middle of the night.[14] Just as in November 2004, Daniel's asthma inhaler was unable to relieve his symptoms when an asthma attack overtook him in the middle of the night, and he had no way of contacting correctional or medical staff to alert them to his emergency. Kitt Decl.-1 ¶ 7; Kitt Dep. 12:13-17, 28:19-24. While Daniel was gasping for breath, his roommate, David Kitt, yelled and banged on the cell door in a frantic attempt to get the attention of correctional staff, but none arrived. Kitt Decl.-1 ¶ 8; Kitt Dep. 11:17-20, 12:8-12. Daniel fell unconscious because he couldn't breathe. Kitt Decl.-1 ¶ 8. The other inmates in E-Dorm began to yell and bang on their cell doors and walls, stomp on the ground, and throw lit toilet paper into the common area of the dorm.[15] Finally, after between fifteen and

---

[14] Kitt Decl.-1 ¶ 7; Kitt Dep. 12:3-8; A. Rivera Decl.-1 ¶3; A. Rivera Dep. 7:24-25, 8:1-6; Cotto Decl.-1 ¶ 5; Cotto Dep. 29:8-10; Berrios Decl.-1 ¶ 5; Berrios Dep. 20:16-22; L. Rivera Decl-1 ¶ 4; Thompson Decl. ¶ 4.

[15] Thompson Decl. ¶¶ 4-7; Berrios Decl.-1 ¶¶ 5-12; Cotto Decl.-1 ¶¶ 5-11; L. Rivera Decl.-1 ¶¶ 4-9; A. Rivera Decl.-1 ¶¶ 3-7; Kitt Decl.-1; ¶¶ 6-14. *See also* A. Rivera Dep. 11:12-21; Cotto Dep. 29:12-14, 31:3-25, 32:1-13; Berrios Dep. 20:23-25, 21:1-12.

forty-five minutes had passed, an officer responded to Daniel's cell.[16]  After at least two separate calls for medical assistance, a nurse finally arrived.  Record of Asthma Emergencies at 31; Presley Baker Decl. ¶¶ 4-14.  By that time, Daniel appeared to have no pulse, his fingernail beds were blue, and his facial coloring was blue.  Kitt Dep. 42:1-2, 11-13; A. Rivera Dep. 34:16-19; Berrios Dep. 22:6-9.  Kathy Presley Baker, the nurse who responded, believes that Daniel was already dead when she arrived.  Presley Baker Decl. ¶¶ 14.  Less than twenty minutes later, Daniel was pronounced dead by Emergency Medical Services.  His cause of death was Bronchial Status Asthmaticus. Record of Asthma Emergencies at 35.

The next morning, the Lake County Medical Examiner confirmed Daniel's cause of death, and the toxicology report did not reveal the presence of any drugs at the time of his death that may have contributed to the cause of death as reported.[17]  *See* Record of Asthma Emergencies at 35-39. Daniel would have had only six months remaining on his sentence at the time of his death, and was just shy of his 25th birthday.

## II.  Daniel Wolfe Suffered from a Disability Under the Americans with Disabilities Act

Daniel Wolfe suffered from chronic, pervasive, and severe asthma since childhood, which continued throughout his incarceration until his untimely death.  It substantially limited his breathing and other major life activities.  Contrary to Defendant's argument, Daniel suffered from a disability within the meaning of the Americans with Disabilities Act (ADA).[18]

---

[16] Kitt Dep. 13:14-18; Cotto Dep. 33:1-4.  *See also* Berrios Decl.-1 ¶ 7; Cotto Decl.-1 ¶ 9; Kitt Decl.-1; ¶ 10; Thompson Decl. ¶ 5.

[17] A bottle of Timolol eye drops was found in Daniel's cell.  Kitt Decl.-3 ¶ 4.  The Timolol belonged to Daniel's roommate, David Kitt.  *Id.* ¶ 6.  Mr. Kitt had the bottle for purposes of storing tattoo ink; he kept it filled with the Timolol so the bottle would not get confiscated.  *Id.* ¶ 3.

[18] Plaintiff acknowledges that some courts have held that the ADA Amendments Act (ADAAA) does not apply retroactively.  However, the ADAAA does express what Congress always meant with the ADA, and thus should be given persuasive effect.  *See Rohr v. Salt River Project Agricultural Imp. & Power Dist.,* 555 F.3d 850, 862 (9th Cir. 2009) ("While we decide this case under the ADA, and not the ADAAA, the original congressional intent as expressed in the amendment bolsters our conclusions."); *Ryan v. Columbus Regional Healthcare System, Inc.,* 2012 WL 1230234, *3 (E.D.N.C. April 12, 2012)  ("The ADAAA was intended to clarify congressional intent with respect to the original ADA."); *Gersman v. Group Health Ass'n, Inc.,* 975 F.2d 886, 907 (D.C. Cir. 1992) (Wald, J., dissenting) ("When a law purports to restore the status quo in existence prior to an intervening Supreme Court decision, the application of that law to conduct occurring

"The term 'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(2)(A). Regulations promulgated under Title II of the ADA define "impairment" as "[a]ny physiological disorder or condition . . . affecting one or more of the following body systems: . . . respiratory." 28 C.F.R. § 35.104(1)(i)(A). Further, "[t]he phrase major life activities means functions such as . . . breathing." 28 C.F.R. § 35.104(2). Defendant does not dispute that Daniel Wolfe suffered from severe asthma (an impairment affecting his respiratory system), nor does Defendant dispute that breathing is a major life activity. *See* Motion at 4, 9. Thus, the remaining dispute is whether Daniel's major life activities were substantially limited.

Although at the time of Daniel's death there were no regulations under Title II defining the phrase "substantially limits," the Equal Employment Opportunity Commission (EEOC) had issued regulations that courts have relied upon. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194-96 (2002). The Supreme Court has explained:

> According to the EEOC regulations, "substantially limit[ed]" means "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."

*Id.* at 195-96 (quoting 29 C.F.R. § 1630.2(j) (2001)).[19] To determine whether an individual is substantially limited in a major life activity, the EEOC instructed that the following factors should

---

prior to the decision would obviously not frustrate the expectations of the parties concerning the legal consequences of their actions at that time."). Thus, Congress's clarification that it wanted the ADA to be construed broadly in favor of a finding of disability should guide this Court's decision, even if the ADAAA does not apply retroactively. To do otherwise would simply continue to perpetuate the injustice of enforcing a law in a manner that Congress made clear years ago was wrong.

[19] As noted by the Tenth Circuit, the specific holding of *Toyota Motor Mfg.* is not applicable to this case. *See Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1250 (10th Cir. 2004) (citations omitted) ("The Court in *Toyota* did not set down the rule that all people claiming a disability must show an inability to perform the variety of tasks required to be performed in most people's daily lives. It is clear from the opinion in *Toyota* that the Supreme Court was concerned only with what substantially limited meant in terms of the performance of manual tasks which was the major life activity affected by the plaintiff's disability in that case. The Supreme Court's analysis regarding the impact of the disability

be considered: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Id.* (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii) (2001)).[20] Thus, the determination should be an individualized inquiry.

The evidence in the record clearly establishes that Daniel met this standard, under both prongs of the EEOC's definition: He was "unable to perform a major life activity"—breathing— that the average person in the general population can perform without difficulty. And he was significantly restricted in the condition, manner, and duration under which he could breathe normally, as compared to an average individual. Thus, taking into account the EEOC factors—the nature, severity, duration, and permanency of the impairment—a jury could easily conclude that Daniel Wolfe's breathing was substantially limited.[21] *See Brown v. Georgia Dep't of Corrections*, 2008 WL 795086, *3 (M.D. Ga. Mar. 4, 2008) ("Courts have recognized that serious asthma can render an individual as disabled pursuant to the ADA.").

The record evidence demonstrates that Daniel did not simply have a form of asthma that flared up occasionally; rather, Daniel's condition was a constant debilitating presence. He experienced frequent shortness of breath and difficulty breathing throughout the day, every day, and as a result always carried his rescue inhaler with him, and used it many times a day. Wolfe Decl. ¶ 2; A. Rivera Decl.-2 ¶ 5; L. Rivera Decl.-2 ¶ 3; Kitt Decl.-2 ¶ 5. He would have difficulty breathing

---

relevant in that case on the ability to perform basic tasks does not apply to what is required to show a substantial limitation in the major life activity of breathing.").

[20] These were the regulations in effect at the time of Daniel Wolfe's death. As noted above, the ADAAA broadened the definition of disability, and as such the regulations have been amended accordingly. *See* 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard.").

[21] To deny Defendant's Motion, this Court need not affirmatively find that Daniel was disabled under the ADA, only that a jury could so find. *See Whillock v. Delta Air Lines, Inc.*, 926 F. Supp. 1555, 1562-63 (N.D. Ga. 1995) (citation omitted) ("Although the evidence Defendant presents may fairly be said to strongly counter certain evidence Plaintiff submits on the issue whether she suffers from a disability, it is the charge of this Court to determine only whether Plaintiff has presented sufficient evidence to create a jury issue whether she has a disability. In other words, the Court must determine whether, viewing all evidence in the light most favorable to Plaintiff, a jury could find that Plaintiff has a disability.").

doing everyday activities like walking, exercising, laughing, and singing.  Berrios Decl.-2 ¶¶ 4-5; A. Rivera Decl.-2 ¶¶ 7-9; L. Rivera Decl.-2 ¶ 4.  Often Daniel would simply be sitting down and all of a sudden could not breathe.  Wofe Decl. ¶ 3; Berrios Decl.-2 ¶ 5; Cotto Decl.-2 ¶ 5; L. Rivera Decl.-2 ¶¶ 5-7; Cotto Dep. 17:13-18.  As a child he would sometimes wake his mother up in the middle of the night, complaining that he could not breathe.  Wolfe Dep. 92:22 – 93:24.  He could not work in the prison kitchen because it was an enclosed space that contained many chemicals, and he would experience difficulty breathing by being there.  Wolfe Decl. ¶ 7; A. Rivera Decl.-2 ¶ 11; L. Rivera Decl.-2 ¶ 6.  Whenever he would try to sing, he would have to stop early because he would experience shortness of breath, and had to use his inhaler, which did not always work to ameliorate his symptoms.  Berrios Decl.-2 ¶ 5; L. Rivera Decl.-2 ¶ 5; Cotto Decl.-2 ¶ 5.  Daniel rarely went outside, especially on hot days and when there were various allergens in the air.  A. Rivera Decl.-2 ¶¶ 7-9; L. Rivera Decl.-2 ¶ 4.  There were at least thirty-three common things that Daniel was allergic to (including grass, evergreen, various plants, and cats) and exposure to them would trigger his asthma symptoms resulting in an inability to breathe.  Wolfe Decl. ¶ 6; Wolfe Dep. 66:3-15; Vazquez Decl.  He rarely played sports for fear it would cause him not to be able to breathe, and when he did, he could not play for long, because when he tried he would have difficulty breathing.  A. Rivera Decl.-2 ¶¶ 7-9; L. Rivera Decl.-2 ¶4.  At one point, other inmates attempted to get Daniel to join their softball team—he tried to play, but had to stop almost immediately, because he could not breathe. A. Rivera Decl.-2 ¶ 9; L. Rivera Decl.-2 ¶ 4.

Daniel's medical records confirm that his asthma had a constant debilitating effect on him. While incarcerated, Daniel experienced seventeen different asthma emergencies.  Record of Asthma Emergencies.  These were not just asthma attacks (as Daniel experienced shortness of breath and difficulty breathing on a daily basis); rather, they were emergencies that required visits to the medical department, hospitalization, overnight stays in the prison infirmary, or other advanced medical care

like a nebulizer treatment.   In November of 2004, Daniel experienced a near-fatal asthma attack, where he passed out in his cell and had to be rushed to the Emergency Room, where he was revived. Harmon-Palaile Decl.; Cunningham Decl. ¶ 4; Smith Decl. ¶ 4.   These hospitalizations strongly indicate that Daniel was substantially limited in a major life activity.   *See School Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 281 (1987) ("This impairment [tuberculosis, a respiratory condition] was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment.");[22] *Hunt v. St. Peter School*, 963 F. Supp. 843, 850 (W.D. Mo. 1997) (holding that an asthmatic plaintiff was handicapped under the Rehabilitation Act because she had been hospitalized on several occasions for her asthma and required continuous medications and treatments).   Thus, there is more than enough record evidence for a jury to conclude that Daniel's major life activities were substantially limited.[23]

The case of *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242 (10th Cir. 2004), is directly on point.   In *Albert*, the court held that an individual's breathing was substantially limited by her asthma when "[t]he evidence concerning Albert's reactions to common substances, the limitations on her activities, her multiple hospitalizations, and her frequent trips to the emergency room all support Albert's contention that she does not 'breathe as well as [other people].'"   *Id.* at 1251 (second brackets in original).   The plaintiff in *Albert* put forth evidence that her asthma required her to avoid "a wide variety of everyday situations[,]"  and further that she had to avoid certain substances like pollen, dust, cat dander, certain kinds of foods, cleaning agents, and chemicals.   *Id.* at 1250-51.   The court noted that such evidence suggested "that the condition and

---

[22] Although *Arline* was decided under the Rehabilitation Act, the standards for determining whether a person is handicapped under the Rehabilitation Act or disabled under the ADA are the same.   *See Bennett-Nelson v. Louisiana Bd. Of Regents*, 431 F.3d 448, 455 (5th Cir. 2005).

[23] Plaintiff would also note that many of the cases cited rely on evidence from doctors who evaluated the plaintiffs for purposes of the lawsuit.  Obviously, no such evaluation is possible here because Daniel died as a result of his disability. Thus, Plaintiff is required to rely on the past recollections of family and acquaintances for evidence of Daniel's disability, as well as medical records from when he was in custody.  Plaintiff should not be penalized in this litigation because she is unable to manufacture the requisite evidence by getting a medical evaluation.

- 11 -

manner under which Albert is able to breathe freely may be significantly restricted." *Id.* at 1251. Finding that she had "presented sufficient evidence that her condition differentiates her from the general populace," the court held that her asthma substantially limited her breathing, and therefore she was disabled under the ADA. *Id. See also Schmidt v. Mercy Hosp. of Pittsburgh*, 2007 WL 2683826, *2 (W.D. Pa. Sept. 7, 2007) ("Plaintiff is not required to specifically set forth how her ability to breathe compares with the average person's ability to breathe in order to survive summary judgment. Rather, Plaintiff must present sufficient evidence from which a factfinder reasonably could conclude that Plaintiff's asthma/ occupational asthma significantly restricts her ability to breathe as compared with an average person in the general population.").

Here, Plaintiff has put forth nearly identical evidence.  Daniel's asthma limited him in numerous activities (such as walking, playing sports, working in the kitchen, singing, and others), it was triggered by heat, he had to avoid numerous substances, and he was hospitalized multiple times for asthma-related emergencies.  Just as in *Albert*, there is more than enough evidence to differentiate Daniel from the general populace, and more than enough evidence for a jury to conclude that his ability to "breathe freely [was] significantly restricted." *Id.*

Indeed, although the case law indicates that run-of-the-mill asthma generally will not be considered a disability under the ADA, numerous courts have recognized that an individual with severe and persistent asthma—like Daniel—is considered disabled under the ADA. *See, e.g., King v. England*, 2007 WL 1845627, *6 (D. Conn. June 22, 2007) (asthma substantially limits breathing "where the plaintiff has a long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition"); *Geuss v. Pfizer, Inc.*, 971 F. Supp. 164, 169-70 (E.D. Pa. 1996) (refusing to overturn a jury's finding that plaintiff was disabled where plaintiff had frequent asthma attacks triggered by minor physical exertion and had to avoid certain substances); *Schmidt*, 2007 WL 2683826 at *2 (sufficient evidence for jury to find plaintiff disabled

- 12 -

where she was never hospitalized, suffered several asthmatic episodes, and had poor results on lung function tests); *Whillock v. Delta Air Lines, Inc.*, 926 F. Supp. 1555, 1562 (N.D. Ga. 1995) *aff'd*, 86 F.3d 1171 (11th Cir. 1996) (jury could find plaintiff disabled where she suffered from syndrome that resulted in violent reactions to chemicals requiring administration of oxygen, even though she could do other activities like grocery shopping, visiting her mother-in-law, and dining out once a week); *Treadwell v. Dow-United Technologies*, 970 F. Supp. 962, 971 (M.D. Ala. 1997) (evidence sufficient to present a jury question on whether the plaintiff was disabled where plaintiff suffered three on-the-job allergic reactions to chemicals that resulted in breathing difficulties).

Under certain case law that has since been repudiated by the ADAAA, an impairment was not considered a disability if it was largely controlled with medications and was episodic in nature. *See Wofsy v. Palm Shores Retirement Community*, 2008 WL 151892, *6-7 (M.D. Fla. Jan. 15, 2008). However, as noted above, the evidence in the record clearly demonstrates that Daniel's asthma was <u>not</u> controlled with medication, and it was <u>not</u> episodic in nature. Rather, Daniel experienced all of the above symptoms on a constant basis and nearly died on one occasion, despite the fact that he was constantly using his rescue inhaler, regularly taking an inhaled corticosteroid (QVAR), getting regular nebulizer treatments, and making frequent trips to the prison infirmary. *See Paine v. Johnson*, 2010 WL 785397, *7 (N.D. Ill. Feb. 26, 2010) ("Moreover, where medications are not able to perfectly control a mental illness, an individual may be considered disabled under the ADA even if she is completely medication compliant."). Plaintiff has, at the very least, presented sufficient evidence to create a jury issue on whether Daniel's asthma was well controlled. *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp.2d 567, 579 (S.D.N.Y. 2008) ("In any event, there is a genuine

issue of material fact as to whether Monterroso's asthma could have and would have been controlled with medication to the degree that she would no longer qualify as disabled under the ADA.").[24]

The cases cited by Defendant are readily distinguishable. *Wofsy*, for instance, was a case involving ADA discrimination against an employer in which the plaintiff's asthma was not nearly as severe as Daniel Wolfe's. *Wofsy*, 2008 WL 151892 at *1. The plaintiff in *Wofsy* used asthma medications with "good relief," his normal activity level was "quite good," and he was not limited in daily routines from his asthma. *Id.* at *4. His condition was characterized as "[m]ild persistent asthma with mild exacerbation," and he had only been hospitalized twice, after which his doctor characterized his asthma as "under fairly good control." *Id.* That is a far cry from the persistent, chronic, severe asthma that Daniel suffered from, which resulted in numerous hospitalizations, one near-fatal asthma attack, and a substantial restriction in activities. Similarly, in *Ventura v. City of Independence*, 1997 WL 94688, *2 (6th Cir. 1997), the plaintiff could easily engage in a variety of outdoor aerobic activities, was not hospitalized, and was only complaining that he could not perform one particular job because of his asthma. In *White v. Honda of America Mfg., Inc.*, 241 F. Supp.2d 852, 857 (S.D. Ohio 2003), the plaintiff's asthma "only affect[ed] her when she breathe[d] certain irritants like exhaust and paint fumes," and her attacks were only "intermittent." *Id.* at 856. Daniel's asthma was much more severe than the plaintiffs' in *Ventura* and *White*.

Lastly, *Charbonneau v. Gorczyk*, 838 A.2d 117 (Vt. 2003), was not about asthma or a substantial limitation on breathing. In *Charbonneau*, the plaintiff requested a transfer to a work camp to gain faster sentence reduction credits. *Id.* at 119. The prison, recognizing that his medical condition required access to 24-hour medical care, denied his request because no constant medical care was available at the work camp. *Id.* The court went on to consider whether his "working ability" was substantially limited by his condition, which it was not because the only limitation

---

[24] "There is no requirement, express or implied, that an individual with an allegedly controllable disability must control her condition in order to be protected by Title II." *Paine*, 2010 WL 785397 at *5.

presented by his condition was the occasional episode that required medical attention. *Id.* at 120. Between episodes, the plaintiff experienced no symptoms. The instant case is completely different. Here, the question is whether Daniel's breathing—not his working ability—was substantially limited. Between attacks, Daniel continued to suffer from shortness of breath and difficulty breathing every day that required the use of his rescue inhaler. Moreover, Daniel's numerous asthma attacks are only one piece of evidence showing that his breathing was substantially limited. As detailed above, he was also prevented from engaging in numerous activities and had to avoid certain substances. In contrast, the plaintiff in *Charbonneau* was perfectly fine between episodes, and could do anything that an average prisoner could. Daniel could not.

Finally, Defendant mischaracterizes several portions of the record in an effort to paint Daniel as an active person. *See* Motion at 12. The evidence cited simply does not go as far as Defendant would like it. For instance, the fact that Daniel "worked various jobs" does not mean that he wasn't constantly experiencing asthmatic symptoms while working those jobs, and does not show what kind of breathing limitations he experienced while employed. Wolfe Decl. ¶ 7. In terms of playing sports, the record contains the affidavits of several witnesses who testify that Daniel could not play sports, including basketball—he attempted it, but when he did, he would have to stop, because he could not breathe.[25] A. Rivera Decl.-2 ¶¶7-9; L. Rivera Decl.-2 ¶ 4. Thus, the evidence cited either does not support Defendant's argument or is contradicted by other evidence in the record, creating a genuine dispute of material fact on this point.[26]

In sum, Daniel Wolfe did not have a typical case of asthma. His asthma was chronic, persistent, and severe. He experienced shortness of breath and difficulty breathing every day,

---

[25] Although Defendant notes that Daniel did vacuuming around the house, Lynn Wolfe actually testified that this was the "most strenuous chore" that he did. Wolfe Dep. 80:6-9.

[26] Defendant also notes that Daniel was a smoker. The evidence for this is a BioPsychoSocial Assessment form which recorded Daniel's answers about his past, which is likely inadmissible hearsay. Moreover, any evidence of smoking while incarcerated is contradicted by several witnesses who testified that Daniel did not smoke. A. Rivera Dep. 47:2-7; Cotto Dep. 49:19-50:10; Berrios Dep. 35:8-17;Thompson Dep. 15:9-10. Further, a Respiratory Assessment completed on June 5, 2005 indicated that he was a "former smoker." Record of Asthma Emergencies at 15.

throughout the day.  He could not participate in many activities and had to avoid many substances and situations.  His asthma was poorly controlled with medication, he was hospitalized numerous times for asthma emergencies, and he experienced one near-fatal attack.  Thus, there is more than enough evidence in the record for a jury to conclude that Daniel's asthma substantially limited his breathing such that he could not breathe under the same conditions, in the same manner, and for the same duration as an average person.  For these reasons, Daniel was disabled under the ADA.

## III.    Eleventh Amendment Immunity Has Been Validly Abrogated

### A.  *Plaintiff Has Sufficient Evidence to Prove an Actual Constitutional Violation*

Defendant correctly acknowledges that Title II validly abrogates sovereign immunity for conduct that actually violates the Constitution. *United States v. Georgia*, 546 U.S. 151, 159 (2005). Although Defendant half-heartedly suggests that immunity has not been validly abrogated in this context, it offers no actual argument on this point.  Defendant's only argument seems to be that Plaintiff has failed to identify which constitutional provision has been violated.  *See* Motion at 15.

Plaintiff has put forth sufficient evidence for a jury to find that Defendant's conduct violated Daniel's rights under the Eighth and Fourteenth Amendments.[27]  As in the instant case, where a prison, through its policies and/or the actions of its agents, fails to meet its affirmative obligations or is deliberately indifferent to a disabled inmate's need for a reasonable accommodation, and that conduct places the inmate at a substantial risk of injury or death, the prison violates the Eighth Amendment.[28]

---

[27] The Fourteenth Amendment's Due Process Clause incorporates the Eighth Amendment as it applies to the states. *Brown v. Plata*  131 S.Ct. 1910, 1922 (2011).

[28] *See Georgia*, 546 U.S. at 159 (finding Eighth Amendment and ADA violations where prison officials deliberately refused to accommodate an inmate's disability-related needs); *Boyd v. Johnson*, 2011 WL 1196320 at *6 (S.D. Ill. Mar. 29, 2011); *Norfleet v. Walker*, 2011 WL 245529, *1 (S.D. Ill. Jan. 25, 2011); *Beasley v. Harris*, 2011 WL 766980, *3 (S.D. Ill. Feb. 25, 2011); *Carlson v. Green*, 446 U.S. 14 (1980) (affirming a violation of the Eighth Amendment when prison improperly housed asthmatic inmate, failed to provide him with adequate medical treatment, and delayed his transfer to a hospital); *Kearsey v. Williams*, 2005 WL 2125874  (S.D.N.Y. Sept. 1, 2005) (asthmatic inmate who was denied an inhaler stated Eighth Amendment claim); *Garvin v. Armstrong*, 1998 WL 547117 (N.D. Ill. Aug. 20, 1998) (inmate who was denied access to asthma inhaler, causing him to black out during a serious asthma attack, stated Eighth Amendment claim);

For example, the court in *Boyd v. Johnson* found that sovereign immunity was validly abrogated in a claim nearly identical to the one here.  2011 WL 1196320 (S.D. Ill. Mar. 29, 2011).  In *Boyd*, an inmate with epilepsy alleged that his rights under Title II of the ADA were being violated because prison officials refused to provide him with an emergency call button and a sign so that he could alert guards if he had a seizure.  *Id.* at *1, *6.  Specifically, on one particular date, the inmate was unable to summon help when he was having a grand mal seizure.  *Id.* at *7.  The court held that these allegations were sufficient to establish an Eighth Amendment violation, and therefore sovereign immunity was validly abrogated.  *Id.*

The FDOC's conduct was far more egregious than the allegations in *Boyd*.  As further demonstrated below, Daniel's Eighth and Fourteenth Amendment rights were violated, and therefore sovereign immunity has been validly abrogated in this context.

## B.  The FDOC Has Waived Eleventh Amendment Immunity

In the context of accommodation claims, when a state agency receives federal funds it expressly waives Eleventh Amendment immunity for purposes of both the Rehabilitation Act and Title II of the ADA.  *O'Neil v. Texas Dept. of Criminal Justice*, 804 F. Supp.2d 532, 539 (N.D. Tex. 2011) ("Because TDCJ has waived its sovereign immunity under the Rehabilitation Act, it is likewise not immune from a similar claim under the ADA."); *Barea v. State University of New York at Albany*, 2006 WL 1911602, *3 n.6 (N.D. N.Y. July 10, 2006) ("*Bennett-Nelson* held that Title II of the Americans with Disabilities Act of 1990 and section 504 of the Rehabilitation Act of 1973 properly provided for waiver of state sovereign immunity conditioned upon the state's receipt of federal funds."); *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005).  An agency is subject to the Rehabilitation Act if any of its divisions receive federal funds.  *Lussier v. Dugger*, 904 F. 2d 661, 665 n.5 (11th Cir. 1990) (receipt of federal funds by FDOC  subjected the Department's

---

*Whitley v. Burckhard*, 1997 WL 659100 (S.D. N.Y. Oct. 22, 1997) (asthmatic inmate who was placed in poorly ventilated cell, causing her to suffer asthma attack, stated Eighth Amendment claim).

Division of Medicine to the Rehabilitation Act even though that Division received no federal funds); *Bay Farms Corp. v. Great American Alliance Ins. Co.*, 2011 WL 6099367, *9 (M.D. Fla. Dec. 07, 2011). The FDOC is a well-known recipient of federal funds.[29]   Accordingly, because the FDOC has subjected itself to the Rehabilitation Act by accepting federal funds, the FDOC has waived any Eleventh Amendment immunity it may have had with respect to accommodation claims under Title II.

Alternatively, if the Court is disinclined to find waiver for the ADA claim, Plaintiff's Amended Complaint states a Rehabilitation Act claim, as it more than satisfies Rule 8(f), despite the fact that Plaintiff has not used the magic words "Rehabilitation Act."[30]   "Where a claim is based on the failure to provide reasonable accommodations, the ADA and RA are identical in scope." *McCoy*, 2006 WL 2331055 at *5.   Therefore, the Defendant has received sufficient notice of a Rehabilitation Act claim, and because the FDOC waived sovereign immunity under the Rehabilitation Act by accepting federal funds, it is subject to suit for damages. *See Lussier*, 904 F.2d at 665.

---

[29] *See* FY 2005-2006 Florida Department of Corrections Annual Report The Guidebook to Corrections in Florida at pp. 1, 5, available at: http://www.dc.state.fl.us/pub/annual/0506/accomplishments.html; Florida Department of Corrections Annual Report FY 2006-2007 The Guidebook to Corrections in Florida at p. 12, available at http://www.dc.state.fl.us/pub/annual/0607/accomplishments.html; *Brady v. Florida Dept. of Corrections*, Case No. 4:11-cv-00510-RH-WCS (N.D. Fla.), Third Amended Complaint and Defendants Department of Corrections and Vivian Ogg's Answer and Defendants to Plaintiff's Third Amended Complaint at ¶¶ 6, 109.

[30] *See Barrios v. Kody Marine, Inc.*, 2000 WL 422392, *1 (E.D. La. Apr. 17, 2000) (holding that " … although Plaintiff may not have specifically pled negligence by the requisite codal articles, the Court finds that Plaintiff provided fair notice of her claim for negligence and the grounds upon which that claim rests."); *Rose Fuel Oil & Heating Co. v. Kia Motors of America, Inc.*, 2004 WL 1202901, *1 (E.D. Pa. June 1 2004) ("Although Rose Fuel did not include any reference to a purchase contract or warranty, we do not require talismanic phrases or magical words to alert a defendant to a cause of action.   Our focus is not on the use of magic words rather 'the adequacy of the complaint must be judged by examination of the facts pled, and not of the conclusions of law that accompany them.") (citations and internal quotations omitted); *Drumheller v. Central Virginia Elec. Co-op.*, 2006 WL 2403334, *3 (W.D. Va. Aug. 18, 2006) ("[I]t would be inconsistent with Rule 8(f) to require a plaintiff to use particular terms or 'magic' words when the facts pled in the complaint support a claim for relief."); *Andrews v. Fuoss*, 2004 WL 5565020, *5 (D.S.D. May 3, 2004) (At the summary judgment stage, court found that general allegations in complaint read in conjunction with Fourth Amendment unreasonable search and seizure claim were sufficient to put defendant on notice of excessive force claim.).

IV.     The Framework of an ADA Reasonable Accommodation Claim

   A. *Plaintiff Has Ample Evidence to Make her Prima Facie Case*

Because this case involves the failure to accommodate a disabled individual, the elements cited in the first two paragraphs of Section IV of Defendant's Motion are inapplicable.  Here, the plaintiff establishes her *prima facie* case by demonstrating that (1) she is a qualified individual with a disability; (2) she requested an accommodation or the need for an accommodation is obvious;[31] and (3) the defendant failed to provide such an accommodation.  *See Tennessee v. Lane*, 541 U.S. 509, 536-37 (2004); 28 C.F.R. § 35.130(b)(7); *Bennett-Nelson*, 431 F.3d at 454-55 (holding that a plaintiff need not prove that a defendant's failure to accommodate was caused by "reason of his disability" because, "[w]here a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant"); *McCoy*, 2006 WL 2331055 *5 (S.D. Tex. Aug. 9, 2006).

As discussed above, Daniel was a qualified individual with a disability, therefore satisfying the first element.  Second, Daniel and his mother requested that he be housed where he would be safe and able to access emergency medical services in the event of an asthma attack.  Wolfe Dep. 163:4-164:6; Wolfe Decl. ¶ 8.  Moreover, Daniel's need for an accommodation was patently obvious. He had seventeen separate asthma emergencies while in the FDOC's care, including one where he nearly died as a result of the FDOC's failure to provide him with prompt attention.  *See* Record of Asthma Emergencies.  During these incidents, medical and non-medical personnel were well aware of what was happening.[32]   Finally, Plaintiff has produced more than sufficient evidence that Daniel was not provided with <u>any</u> accommodation for his disability to ensure prompt access to medical

---

[31] *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (where the need for accommodation is obvious, the public entity is on notice that an accommodation is required); *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007) (collecting cases).  Moreover, the Defendant has conceded that it has an obligation to accommodate disabled inmates, where the need for such accommodation is obvious, even if not requested.  M. Taylor Dep. 25:18-26:12.
[32] Therefore, any argument that non-medical personnel were not aware of Daniel's need for an accommodation because of HIPAA considerations is meritless.  *See* Ackerman Dep. 42:6-46:22; Sirmones Dep. 49:4-10 (ADA Coordinator at Lake C.I., who is non-medical personnel, received the name and type of disability that certain inmates had).

services in the event of an asthma emergency. *See, e.g.*, Berrios Dep. 24:14-17; Cotto Dep. 47:20; A. Rivera Dep. 21:25. Accordingly, Plaintiff has sufficient evidence to support a *prima facie* case under the ADA.

### B. The FDOC Has Failed to Meet its Burden

"Upon making out a *prima facie* case of Title II discrimination, the burden shifts to the defendant to show that the accommodation provided was either effective, or that the accommodation sought and not provided would have resulted in a fundamental alteration of the procedures or an undue financial or administrative burden." *Norfleet v. Walker*, 2011 WL 245529, *4 (S.D. Ill. Jan. 25, 2011) (citations and quotations omitted). "This determination is both fact-intensive and context-specific." *Id.*; *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1527 (11th Cir.1997).[33]

Defendant has not even attempted to meet this burden, which should end the matter at summary judgment. *See id.* However, the wide variety of accommodations that Daniel could have and should have received are more than reasonable. These include housing Daniel in an open bay dorm,[34] giving him an emergency call button or body alarm, housing him in a hospital facility or infirmary, or ensuring that he was under constant observation while locked in a cell. McAndrew Decl. ¶¶19-24. Plaintiff has expert testimony of the former Warden of Florida State Prison, and evidence of the widespread use of emergency call buttons in prisons and jails, to show that any of the above accommodations would have been reasonable. *Id.* Moreover, the Chief of Security at Lake C.I., Col. Harris, testified that it would be beneficial to provide inmates with a known serious medical condition with an approved way to contact emergency medical services. Harris Dep. 55:7-

---

[33] In determining whether an accommodation is "reasonable," this Court must balance "all the relevant facts, including: (1) the size, facilities, and resources of the defendant, (2) the nature and cost of an accommodation, (3) the extent to which the accommodation is effective in overcoming the effects of the disability, and (4) whether the accommodation would require a fundamental alteration in the nature of the defendant's program." *McCoy*, 2006 WL 2331055 at *9 (citing 45 C.F.R. § 84.12(c) (1-3)).

[34] An open bay dorm is one in which there are no individual cells. Rather, the inmates sleep in bunks that are situated in the middle of a large open room. This style of dorm is prevalent throughout the FDOC.

56:5.  Accordingly, Plaintiff has raised a genuine issue of material fact as to the reasonableness of the possible accommodations.

### C.  The FDOC Violated the ADA

At page 15 of its Motion, Defendant acknowledges that the "focal point" of Plaintiff's claim is that the FDOC was deliberately indifferent to Daniel's need for a reasonable accommodation in the form of a housing assignment, or other accommodation, that would enable Daniel to access emergency services quickly.  In the very next breath, at page 16, Defendant then mysteriously states that Plaintiff's claim is actually about medical care—a contention that is absolutely incorrect.  **This case is not, and never has been, about medical care**.  It is about the fact that the FDOC was required to provide Daniel with <u>some</u> kind of accommodation—a different housing assignment, emergency call button, etc.—that would prevent him from dying from his next inevitable asthma emergency.  Defendant then cites the deliberate indifference standard for poor prison conditions or medical care—not the standard to be applied here.  *See* Motion at 16.  Finally, after quoting sweeping pronouncements about deference to prisons, Defendant goes on to describe various forms of medical care that Daniel received.  *See* Motion at 17-20.  Conspicuously, Defendant makes no actual argument that the FDOC was not deliberately indifferent to Daniel's need for a reasonable accommodation.  Nonetheless, in the pages that follow, Plaintiff will lay out the framework for a deliberate indifference claim under the ADA and explain the various ways in which the FDOC was deliberately indifferent.

Claims for damages under Title II of the ADA require a showing of intentional discrimination based on deliberate indifference, defined as "both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that ... likelihood."  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001); *Wilson v. Broward County*, 2007 WL 2900389, *9 (S.D. Fla. Sept. 28, 2007) (deliberate indifference is the proper standard for proving intentional

discrimination in ADA and Rehabilitation Act claims). "The deliberate indifference standard, unlike some tests for intentional discrimination, 'does not require a showing of personal ill will or animosity toward the disabled person,' but rather can be 'inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).[35]

Employing this standard, numerous courts have recognized that ADA damages claims are available under circumstances similar to those of the instant case. *See, e.g., McCoy*, 2006 WL 2331055 at *8-*10 (finding there was a genuine issue of fact on whether prison was deliberately indifferent to asthmatic inmate's need for an accommodation by housing him in administrative confinement and by not transporting him out of his cell immediately when he was having an asthma attack, which resulted in his death); *O'Neil*, 804 F. Supp.2d at 539; *Boyd,* 2011 WL 1196320 at *6-7; *Brady v. Fla. De'p. of Corrections*, 2011 WL 5307856 (N.D. Fla. Nov. 1, 2011).

### 1.  The FDOC's Deliberate Indifference

Here, there is ample evidence for a jury to conclude that Defendant knew there was a substantial likelihood that Daniel would suffer grievous harm if he did not receive an accommodation, and failed to act upon that knowledge.  Defendant knew that Daniel had severe lifelong asthma, knew he received extensive treatment for it, knew it was poorly controlled with medication, knew he had seventeen separate asthma emergencies while incarcerated, knew he exhibited daily symptoms, knew that he could not participate in a variety of activities, and knew he experienced a near-fatal asthma attack in the underline manner in which he died.  Motion at 3; Record of Asthma Emergencies; Wolfe Decl. ¶ 7; A. Rivera Decl.¶¶ 7-13; Berrios Decl. ¶¶ 3-5;

---

[35] Moreover, the doctrine of *respondeat superior* applies to claims brought under Title II, and therefore, the actions of the Defendant's employees and agents should be deemed to be those of the Defendant.  *See Pruitt v. Emmanuel County, Ga.*, 2012 WL 1161612, *1 n.1 (S.D. Ga. Apr. 09, 2012) (citations omitted) ("Hence, a jail inmate can recover ADA, Title II money damages from a county, and *respondeat superior* applies in this context."); *T.W. v. School Bd. of Seminole County, Fla.*, 610 F.3d 588, 604 (11th Cir. 2010); *Duvall*, 260 F.3d at 1141.

Cotto Decl. ¶¶ 3-6; L. Rivera Decl. ¶¶ 3-7.  Moreover, Defendant knew that Daniel's housing placed him at a substantial risk of death, as he was housed in E-Dorm, where officers sit in a glass-enclosed officers' station behind a double set of metal doors with no way to observe Daniel without first leaving the building, reentering through another set of doors, going through yet another set of doors, and climbing stairs.  As noted, in E-Dorm, officers typically conduct security rounds every seventy-five to ninety minutes, and the inmates have no approved method to alert staff of an emergency in between these rounds.  As the FDOC admits, response time is crucial when dealing with an asthma attack.  *See* Aydur Dep. at 70:24-71:2; Falk Decl. ¶20.  And, perhaps most importantly, Defendant knew that it was unable to respond to Daniel promptly during his near-fatal 2004 attack.  *See* Harmon-Palaile Decl. ¶¶ 3-26.  Accordingly, Defendant knew that Daniel's housing was inadequate to accommodate his disability, and therefore, placed him at a substantial risk for having his ADA rights violated.

Moreover, according to Plaintiff's Board Certified Emergency Medicine expert, "[b]asic principles of asthma care, as well as common sense, dictates that patients who suffer from asthma be kept in a setting where they have not only continual access to quick-relief medications if clinically warranted, such as a metered dose albuterol inhaler, but also that they be kept in a setting where they have immediate access to emergency treatments if necessary."  Falk Decl. ¶ 20.  "[B]y housing Daniel – a known asthmatic – in a dorm where he did not have the ability to access emergency medical services in the event of an asthma emergency, Daniel's eventual death should have been reasonably foreseeable."  *Id.* at ¶ 21.

Finally, the FDOC completely failed to act upon the substantial likelihood that Daniel's ADA rights would be violated.  The FDOC never altered Daniel's housing, never considered alternative housing, nor did it reevaluate the appropriateness of his housing.  *See* Sirmones Dep. 47:4-7, 50:14-51:3, 57:7-17, 58:7-23; Rhoden Dep. 25:17-26:8, 40:10-21, 42:1-7; M. Taylor Dep.

45:10-20, 51:23-25, 52:19-53:7.   Simply providing regular medical care is not making an accommodation.  Accordingly, there is more than enough evidence in the record for a jury to find that the FDOC exhibited deliberate indifference to Daniel's need for a reasonable accommodation.

### 2.   The FDOC's Policies and Training Amounted to Intentional Discrimination

The FDOC's policies, procedures, and training protocols amounted to intentional discrimination to the disability needs of asthmatics who suffered from frequent and severe asthma attacks.  Defendant presents arguments using standards of municipal liability under section 1983, which are inapplicable here.  *See* Motion at 20-22; *Delano–Pyle v. Victoria County, Texas*, 302 F.3d 567, 574-5 (5th Cir. 2002).  Unlike in the municipal liability cases cited by Defendant, "'[a] plain reading of the ADA evidences that Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.'"  *Pena v. Bexar County, Texas*, 726 F. Supp.2d 675, 686 (W.D. Tex. 2010) (quoting *Delano–Pyle,* 302 F.3d at 575).  "The ADA expressly provides that a disabled person is discriminated against when an entity fails to 'take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.'"  *Id.*

*Policies*

When developing its policies, the FDOC refused to even consider the needs of disabled inmates who require prompt access to emergency medical services, despite their affirmative obligation to do so under the ADA.  42 U.S.C. § 12182(b)(2)(A)(iii); *Bennett-Nelson*, 431 F.3d at 454 ("[B]oth the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals."); *Doe v. Oklahoma City University*, 406 F. App'x 248, 252 (10th Cir. 2010) (quoting *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)) (intentional discrimination can be "inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a

violation of federally protected rights").  Below is a list of evidence showing that the FDOC failed to meet its affirmative obligation to develop policies and procedures to prevent discrimination based on disability:

***FDOC-Wide Policy***

- The FDOC does no investigation to identify disabled inmates after an inmate's initial medical exam.  M. Taylor Dep. 23:14-20, 24:6-14.

- There are no written policies or procedures at intake for how to accommodate asthmatic inmates.  Aydur Dep. 68:1-5.

- There are no non-medical policies that address how to accommodate those inmates whose disabilities are obvious.  *Id.* at 24:24-25:3.

- No non-medical personnel make determinations as to what accommodations asthmatic inmates should be receiving.  *Id.* at 57:13-16.

- The only accommodations made by the FDOC for asthmatic inmates are that they are permitted to keep their rescue inhaler on their person, and they are permitted to request to be brought to medical in the event of an asthma emergency.  *Id.* at 57:11-22.

- The FDOC does not have any asthma disability accommodation procedures.  *Id.* at 75:10-14.

- The FDOC never considered providing emergency call buttons as an accommodation for disabled inmates.  M. Taylor Dep. 5:11-13, 48:5-17.

- The FDOC also admits that there are no special housing accommodations ever made for asthmatic inmates that relate to their ability to contact emergency medical services.  *Id.* at 74:10-16; Aydur Dep. 57:11-58:5.

- The FDOC does not permit asthmatic inmates to have life-saving nebulizers in their cells. M. Taylor Dep. at 35:8-36:20.

***At Lake C.I.***

- The only accommodations made for asthmatic inmates at Lake C.I. were that they were permitted to carry rescue inhalers on their person, they were permitted to request to be transported to medical for medical treatment, and they were permitted to stay in the infirmary for some period of time in order to treat their condition.  Simrones Dep. 19:16-19, 22:25-23:4, 71:6-21.

- Placement in the infirmary was never permanent, nor was it long-term, and no other housing accommodations were ever provided to asthmatic inmates, like Daniel, at Lake C.I. during the time leading up to Daniel's death. *Id.* at 26:12-27:3.

- Housing accommodations for disabled inmates, like Daniel, who required prompt access to emergency medical services, were never even considered. *See Id.* at 19:16-19, 22:25-23:4, 26:12-27:3

- Pursuant to FDOC policy, the Housing Captain at Lake C.I. never reevaluated an inmate's housing, absent a request from the inmate or from medical staff. *Id.* at 25:17-26:8.

- The Housing Captain never considers an inmate's disability when making a housing determination. *Id.* at 40:10-21.

- The only factor taken into consideration for the housing of inmates, like Daniel, was their HO [security] level. *Id.* at 42:1-7.

*Training*

- The FDOC provides no ADA trainings on how to accommodate asthmatic inmates. *See* M. Taylor Dep. at 14:18-23.

- The FDOC has no written procedures on how to accommodate inmates with severe asthma. *Id.* at 18:15-20.

- The FDOC provides no training to housing captains—who are charged with making housing determinations for inmates—regarding the housing of disabled inmates. Rhoden Dep. 10:4-19.

- Housing captains are not trained to reevaluate an inmate's housing, absent a request from the inmate or from medical. *Id.* at 25:17-26:8.

- The training that the ADA Coordinators received was so inadequate, that the ADA Coordinator at Lake C.I. leading up to Daniel's death testified that he is not qualified to make a determination as to whether Daniel was properly housed in E-Dorm. Sirmones Dep. 57:7-17.

- Shockingly, and, as another indication of the training deficiencies, the ADA Coordinator states that even in hindsight, and with all the information the FDOC had about Daniel's asthma, he would not have recommended Daniel be housed differently. *Id.* at 58:7-23.

This "ostrich head in the sand" mentality continues today.  The FDOC, in its Motion, indicates that its trainings are designed to meet the mission of the FDOC.  Motion at 21.  Notably absent from the mission statement, and the descriptions of the trainings provided, is any indication

that it provides any ADA training, any asthma related training, nor any training with respect to how to house inmates who require prompt access to emergency medical services. *See id.* at 20-23.

Thus, the FDOC, despite its affirmative obligation to develop policies to prevent the discrimination that lead to Daniel's death, failed to do so, and for that reason, summary judgment should be denied.

### 3.  Sergeant Ackerman Acted with Deliberate Indifference

In *O'Neil*, the survivor of an asthmatic inmate in the Texas Department of Criminal Justice ("TDCJ") brought a claim under the ADA. 804 F. Supp.2d at 535. The plaintiff was housed in a cell with an emergency call button that was designed to alert TDCJ personnel of an emergency. *Id.* at 537. On the night of the decedent's death, he was suffering from an asthma attack, and his cellmate's attempts to contact TDCJ personnel (including the use of the emergency call button) were ignored by the officer who heard these calls for help. *Id.* at 539. The inmate's disability mandated that he have access to emergency medical services when the need for such services arose, and the court found that the officer's conduct amounted to an intentional disregard of the inmate's disability needs. *See id.* As *respondeat superior* applies in ADA cases, the court concluded that a genuine issue of material fact existed on whether TDCJ was deliberately indifferent when it failed to accommodate the decedent's disability under the ADA. *See id.*

When Daniel Wolfe was having his fatal asthma attack, the inmates on the wing were kicking the cell doors, yelling, and lighting toilet paper on fire from anywhere from fifteen to forty-five minutes before any FDOC staff responded. Thompson Decl. ¶¶ 4-7; Berrios Decl.-1 ¶¶ 5-12; Cotto Decl.-1 ¶¶ 5-11; L. Rivera Decl.-1 ¶¶ 4-9; A. Rivera Decl.-1 ¶¶ 3-7; Kitt Decl.-1; ¶¶ 6-14. Sergeant Ackerman, the supervising sergeant assigned to E-Dorm that night, was in the control room during the time leading up to Daniel's asthma attack. Ackerman Dep. 59:1-15. Sergeant Ackerman was fully aware of Daniel's asthma and its severity, as he responded to and was centrally involved in Daniel's near-fatal 2004 attack. Ackerman Dep. 42:6-46:22. Sergeant Ackerman testified that "[i]f

somebody was kicking on the door, I would have heard it." Ackerman Dep. 70:12-13. Accordingly, like in *O'Neil*, there is sufficient evidence for the jury to conclude that Ackerman acted with deliberate indifference when he heard the inmates' pleas for help, and intentionally ignored them, full-well knowing that Daniel Wolfe was housed in the dorm.

In sum, Defendant has made no argument that it was not deliberately indifferent to Daniel's need for a reasonable accommodation. Because Plaintiff has presented ample evidence that Defendant and its agents were deliberately indifferent in a variety of ways, including a failure to train its agents, Defendant's Motion should be denied.

## V.      Conclusion

The cruel and unusual conditions imposed on Daniel Wolfe at Lake C.I. cost him his life. Defendant knew of Daniel's chronic, persistent, and severe asthma, yet failed to do <u>anything</u> to accommodate his disability. As a result, Daniel, with six months left on his sentence and just shy of his 25th birthday, suffocated to death some thirty feet from the guards while other inmates desperately cried for help. The FDOC could and should have accommodated his disability. It failed to do so with deliberate indifference, and therefore the Motion for Summary Judgment should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

Randall C. Berg, Jr., Esq.
Florida Bar No. 318371
Shawn A. Heller, Esq.
Florida Bar No. 46346
Dante P. Trevisani, Esq.
Florida Bar No. 72912

Florida Justice Institute, Inc.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)
E-mail: *RBerg@FloridaJusticeInstitute.org*

</div>

E-mail: *DTrevisani@FloridaJusticeInstitute.org*
E-mail: *SHeller@FloridaJusticeInstitute.org*

Attorneys for the Plaintiff

By:      *s/Shawn A. Heller*
             Shawn A. Heller, Esq.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 10, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

       *s/Shawn A. Heller*
       Shawn A. Heller, Esq.

**SERVICE LIST**
***Wolfe vs. Florida Department of Corrections***
**Case No. 5:10-cv-663-Oc-PRL**
**Middle District of Florida, Ocala Division**

**Served via CM/ECF**
Samuel R. Mandelbaum, Esq.
srmc@manfitzlaw.com
Scott K. Hewitt, Esq.
skh@manfitzlaw.com
Stephen A. Spaid
sas@manfitzlaw.com
Mandelbaum, Fitzsimmons & Hewitt, P.A.
P.O. Box 3373
Tampa, Florida 33601
813-221-0200
813-221-8558 fax
Counsel for Defendant, Florida Department of Corrections