# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

LYNN WOLFE, as Personal Representative
of the ESTATE OF DANIEL WOLFE, on
behalf of the Estate, and on behalf of Daniel
Wolfe's Survivor, LYNN WOLFE,

        Plaintiff,

vs.                           CASE NO: 5:10-CV-663-Oc-10DAB

FLORIDA DEPARTMENT OF
CORRECTIONS,

        Defendant.

_____/

## EXPERT REPORT OF RON MCANDREW

I, RON McANDREW, am over the age of 18 and make this report and declaration:

## I. Introduction

1.    I have been retained by the plaintiff to render an opinion regarding the death of Daniel Wolfe while in the custody of the Florida Department of Corrections (FDOC), the correctional policies and actions that contributed to his death, and the provision of reasonable accommodations to inmates with chronic conditions in a correctional setting.

## II. Qualifications of the Expert

2.    I wore a correctional officer's uniform and climbed through the ranks of basic recruit correctional officer, certified correctional officer, sergeant, lieutenant, captain, investigative lieutenant, correctional inspector and major at three major prisons in Florida for a period of 9.5 of my 23 years of correctional employment; performing all 'gut level' assignments in open population, administrative confinement, protective confinement and disciplinary confinement, food service, control room assignments, mail room officer, arsenal sergeant, visitation officer, visitation sergeant, inside and outside security officer, receiving officer, work squad supervisor, transfer officer, property room officer, classification review team officer, hospital officer, perimeter security officer, medical officer, psychiatric observation officer, medical escort officer, investigator; escape and recapture officer; confrontation team member

(riot team); training officer and orientation officer; Inspector of all institutional criminal, administrative and accident matters.

3.       Following my experience while in uniform and in the investigative ranks, I was promoted to Assistant Warden at a new (and not yet opened) close-custody prison reception center later named Central Florida Reception Center (CFRC) in Orlando, FL. There, I held the duties of Assistant Warden I, Assistant Warden II of Operations and Assistant Warden II of East Unit. As the Assistant Warden, I worked directly under the Warden, responsible for the operations of the entire institution to include Security, Reception & Processing, Classification, Maintenance, Construction, Personnel, Food Service, Medical, Dental, Psychology, Psychiatric Services, Chaplaincy and ACA coordinator. As Asst. Warden II, my responsibilities were much the same but with shared duties of another Assist. Warden II. CFRC became one of the largest prisons in Florida, with three units and approximately 3,000 inmates. In 1992, I was appointed as a new Warden of a new close-custody prison in Wewahitchka, FL (Gulf Correctional Institution). Within one year this prison absorbed Gulf Work Camp (25 miles to the south) and Franklin Work Camp (71 miles to the east) that raised the population to 3,250 inmates by 1995, making it the largest prison in Florida.

4.       In 1996, I was appointed as the Warden of Florida State Prison in Starke, Florida. Florida State Prison houses some of Florida's death row and at, the time, the electric chair. My duties included complete operational control of the entire prison to include an annex, the "O" unit, a farming program where most of the prison's vegetables were grown, supervision of 3 Assistant Wardens, supervision of approximately 700 employees, the custody and care of 1450 maximum and close custody inmates, and carrying out executions as directed by the Governor of Florida. During my tenure as Warden of Florida State Prison, I testified approximately 3 times in Federal Court on matters related to the use of the electric chair as a method of carrying out executions. My testimony was on behalf of the State of Florida. At least twice during this tenure, I was selected to testify before the State of Florida Legislature, Corrections Committee, on issues related to the death penalty and executions.

5.       In 1998, I was appointed as the Warden of Central Florida Reception Center, which by then was the largest state prison in Florida. It had 3,300 inmates stemming from 4 separate units that included a reception and diagnostic center for all new commitments from the central Florida region. Additionally, my supervision included the East Unit of 1013 inmates, the South Unit 250 inmates (an HIV/AIDS Treatment Facility), and a work release center of approximately 175 inmates.

6.       In 2001, I retired from the State of Florida. Five days into my retirement, I was called by the Orange County Mayor and asked to take over the direction of the 13th largest county jail in the United States, Orange County Jail, FL with 1,761 staff and over 4,400 inmates, an operating budget of $110,000,000 and construction budget of $114,000,000. I agreed to take charge as the Director of Orange County Jail until a national search could be conducted for a replacement. Almost one year later, the new Director was hired and I went into semi- retirement.

7.       My qualifications in the field of corrections are further summarized in my Resume, attached as Exhibit A.

## III. Publications Authored by the Expert Witness

8.     I have written several articles on correctional practices; however, I do not keep records of these articles or the articles themselves.

## IV. Testimony as an Expert Witness at Trial or Deposition

9.     A listing of cases in which I have testified as an expert at trial or deposition within the preceding four years is attached hereto as Exhibit B.

## V. Compensation

10.    My rate of pay is $100.00 per hour to consult and $850.00 per day (or any fraction thereof) for deposition or courtroom testimony, reasonable travel costs, meals and lodging.

## VI. Methodology and Principles Applied In Formulating Opinion

11.    I have reviewed the following materials specific to this case:

(a)     Plaintiff's First Amended Complaint;

(b)     A record of all of Daniel Wolfe's asthma attacks (with Wolfe's Respiratory Assessments)

(c)     Daniel Wolfe's FDOC inmate file

(d)     Daniel Wolfe's FDOC classification file

(e)     Daniel Wolfe's FDOC medical file

(f)     Report from the Office of Inspector General on Daniel Wolfe's death

(g)     Medical examiner's report

(h)     Daniel Wolfe's chronic illness records

(i)     The unsworn declarations and depositions of David Kitt, Alfredo Rivera, Enrique Cotto, Ruben Barrios

(j)     The unsworn declarations of Kathy Preseley Baker and Rose Harmon-Palaile

(k)     Relevant FDOC Post Orders

(l)     Pictures of Daniel Wolfe' cell and the wing where he was housed at Lake Correctional Institution

(m)     Depositions of Scott Ackerman, Randall Taylor, Phyllis Lundy, and Tocarra Ford.

12.    My professional opinions are based on my background, professional experience, education and review of the documents listed above. Additionally, I have consulted with the following persons:  Nurse Daisy at the Hillsborough County Jail; Sgt. Havens at the Denver Downtown Detention Center; the Health Services Administrator at the Bedford Hills Correctional Facility, Westchester County, New York; Kimberly Sousedo and Chief Nurse Walker at the Los Angeles County Jail; Robert Presley at the Riverside County Detention Center in California; Nurse Irma at State Correctional Institution at Greene ("SCI–Greene"), in

Waynesburg, Pennsylvania; Mike Feldman at Jeron Electronic Systems Inc.; and Mike Ahearn at Dynafire Inc.

## VII. Opinion

13.    This case is about a 25-year-old prisoner, Daniel Wolfe, who died while incarcerated at Lake Correctional Institution ("Lake CI"), a prison maintained by FDOC. Medical records show that Daniel suffered from chronic asthma and shortness of breath since he was at least five years old. Throughout his life, he had been hospitalized several times for severe asthma attacks. After he was received into the custody of FDOC, he continued to suffer from severe asthma-related emergencies, and it was well documented.    In fact, prior to being transferred to Lake CI, his medical records document at least four separate asthma-related emergencies at two separate institutions.

14.    After being transferred to Lake CI, Daniel suffered from at least eight more asthma-related emergencies, several of which were characterized as "severe" by FDOC personnel.    One such emergency occurred on November 26, 2004, when Daniel was housed in E-Dorm. On E-Dorm, the officers sit in a glass-encased officers' station behind metal doors, and, according to reports, typically conduct security rounds every hour and fifteen minutes to every hour and thirty minutes. Other than during rounds, there is no approved method for an inmate to alert correctional staff of an emergency. In addition, there are no defibrillators or oxygen canisters in E-Dorm in the event one were to have an asthma attack and need emergency equipment.

15.    During the night of November 26, 2004, Daniel began to experience symptoms of respiratory distress. His cellmate and other inmates in the Dorm frantically attempted to notify the officers. However, an officer did not arrive for quite some time. Before the officer arrived, Daniel lost consciousness. Eventually a nurse was notified, and after a considerable amount of time reached the cell. The nurse pleaded with the correctional staff to let her in the cell. After a long exchange, the officer let her in to Daniel's cell, and she began to administer CPR after noting that Daniel's vital signs were nonexistent. Daniel was ultimately transported to the hospital where, after being declared clinically dead, he was fortunately revived.

16.    After this incident, Daniel's mother, Lynn Wolfe, contacted FDOC several times to request that Daniel be moved to an area where he could notify correctional staff when he was having an asthma attack and/or an area where he could be continuously observed. Daniel also made similar requests. FDOC ignored her and his requests, and placed Daniel back in E-Dorm. While there, Daniel had at least six more asthma-related emergencies.

17.    On August 3, 2006, Daniel suffered what became his final asthma attack. Since it was after dark and all the inmates were locked in their cells, the surrounding inmates desperately attempted to alert the officers by yelling, banging on the cells and throwing lighted toilet paper into the day room area all to little avail. The officers finally noticed something was wrong and eventually came to Daniel's cell but only after a significant amount of time had elapsed. Medical was called, and a nurse finally arrived long after that. At that point, Daniel was not

breathing, had turned blue, and had no pulse.  He was pronounced dead soon thereafter by Emergency Medical Services.

18.    As a warden of three of Florida's largest prisons (certainly in size, scope, budget and difficulty to manage), having served in all uniformed ranks in a total of eight prisons, and as the director of the nation's 13th largest jail (Orange County Jail), I can say without hesitation that Daniel Wolfe should have been provided with housing accommodations that would have allowed FDOC personnel to be informed immediately of an asthma attack, so that they could take appropriate action.  From a correctional standpoint, this was entirely feasible and could have been accomplished by several means, including but not limited to:

    **(a)**    Installing an emergency call button in Daniel's cell so that he could alert the officers in the event of a medical emergency;

    **(b)**    Giving Daniel a portable emergency call button (similar to those provided to visitors) so that he could alert the officers and medical staff in the event of a medical emergency;

    **(c)**    Housing Daniel in an area that would allow the officers to continuously observe him, such an as infirmary or mental health unit;

    **(d)**    Housing Daniel at Reception and Medical Center, one of FDOC's medical facilities, where inmates are provided with more intensive medical supervision; and

    **(e)**    Housing Daniel in a location that had a defibrillator and oxygen on hand.

19.    Had I been the Secretary of the FDOC, ADA coordinator, or other official in charge of policy, I would have written and enforced a policy that required any inmate at risk of having a severe asthma attack while in custody be provided with emergency call buttons and/or be housed in an area that provided near-continuous observation by corrections officers.  One such option would be housing them at one of the Reception and Medical Centers.  Similarly, if I were the Warden at Lake CI or the Classification Officer in charge of housing, I would have given Daniel an emergency call button and/or ensured that Daniel Wolfe was housed in an area that provided him with continuous observation.  The portable emergency call buttons—called Personal Body Alarms—already exist within the FDOC, and are distributed to visitors and some staff.  There is no reason why these portable emergency call buttons are not similarly given to persons with disabilities who experience frequent life-threatening emergencies such as Daniel Wolfe.

20.    Ensuring that inmates are properly housed and classified is a function that is essential to safety and order inside a correctional facility, and as such FDOC—just as any other correctional agency—has policies and procedures in place to ensure that inmates are properly situated to maintain their safety and well-being.  One such factor that must be taken into account is whether an inmate has a chronic condition that could cause a sudden, life threatening episode—such as the type of asthma Daniel suffered from.  Thus, it is my professional opinion that FDOC should have had a policy in place that identified inmates like Daniel and placed them in an area where help could immediately be summoned in the event of an emergency.

21.     In Daniel's case specifically, his initial medical review upon intake to the FDOC clearly indicated that he posed an extremely high risk of suffering a severe asthma attack. Further, after the November 2004 episode, Daniel and his mother repeatedly requested that the FDOC provide Daniel with a reasonable accommodation for his asthma. Thus, the FDOC knew of the risk of a future life-threatening asthma attack and failed to accommodate it. From a correctional standpoint, is my professional opinion that a housing accommodation should have been provided. There is no reason, from a correctional perspective, that Daniel should not have received one. In light of the aforementioned notice, the only explanation for why Daniel was not provided such an accommodation constituted deliberate indifference by the FDOC.

22.     I am further of the opinion that if FDOC had complied with sound correctional practices and its obligations to provide those with disabilities with a reasonable accommodation pursuant to the ADA, and housed Daniel in a manner that accommodated his disability and ensured immediate access to medical attention, Daniel's tragic death could have been prevented.

23.     I have located several examples of facilities that use emergency call buttons including, but not limited to, the Hillsborough County Jail in Florida; the Denver Downtown Detention Center in Colorado; the Bedford Hills Correctional Facility in Westchester County, New York; the Riverside County Detention Center in California; the Los Angeles County Jail in California; and the State Correctional Institution at Greene ("SCI–Greene"), in Waynesburg, Pennsylvania. The emergency call buttons are used in a variety of areas, including, but not limited to, the infirmaries, "step down" areas, holding cells, and housing for chronically ill and/or disabled inmates. The prison and jail staff I interviewed at these institutions indicated that the emergency notification systems are essential, work well, and ultimately save lives.

24.     The practice of using emergency call buttons in correctional institutions is widespread throughout the country, and is a reasonable, practical, and necessary accommodation made for disabled inmates, who may require emergency medical services. Prison and jail officials have reported that the buttons are "life savers." There are many companies, including companies based in Florida, which manufacture and install these "tamperproof systems," and have been doing so for more than a decade.

25.     I have reviewed the February 13th, February 23rd, and March 30th submissions from the Defendant's expert, Michael Sullivan. With regard to Mr. Sullivan's 2/13/12 document, in my opinion Mr. Sullivan's claim that the late Mr. Wolfe was not denied or excluded from participation in the benefits of the services, programs or activities of the FDOC while at Lake C.I. ("the FDOC did not discriminate against Mr. Wolfe") is totally without basis. I specifically note the following:

(a)     Mr. Sullivan is, according to his CV, a retired police sergeant, has never worked in corrections, and is not a medical doctor. Therefore, in my opinion he is not qualified to say if Mr. Wolfe received appropriate medical or psychiatric care, nor is he qualified to opine on the specific issue of providing a reasonable accommodations in a correctional setting.

(b)     As both an Asst. Warden and as a Warden, I personally appointed numerous ADA coordinators and also served as a 'member' of the ADA Review Team on occasions at various institutions to include Central Florida Reception Center 1988/1992 and again, 1998/2001 in the Florida Department of Corrections. And as the Warden, I was ultimately

responsible for ensuring full compliance with the ADA, not the ADA Coordinator at the institution which is usually the Assistant Warden. As a result, I attended seminars and parts of warden's conferences involved training in ADA coordination and compliance. Thus, when Mr. Sullivan states in his 2/23/12 document that "I found no indication in the documents provided that Mr. Wolfe was ever identified as an Impaired Inmate," I believe this only solidifies the shortcomings of those reviewing Mr. Wolfe in terms of FDOC's failure to not only identify Mr. Wolfe as an inmate with special needs, but to treat him accordingly. As a member of an ADA Review Team I would have certainly made such identification, and as a Warden, I would have insisted that Mr. Wolfe be treated as such.

    (c)  As noted above, while Mr. Sullivan states in his 2/23/12 report that Mr. Wolfe was not denied or excluded from participation in any FDOC programs, in the final paragraph of the same report he states that the FDOC's "Impaired Inmate Services" Technical Instruction "ensures that an inmate is not inappropriately confined in a classification that would penalize him/her because of his/her disability. Confinement in such an inappropriate classification would deny that inmate the opportunities to participate in programs that could aid in his/her rehabilitation and gain time credits." Mr. Wolfe, however, was penalized because of his disability in exactly the manner described by Mr. Sullivan – Mr. Wolfe was confined to an inappropriate classification that denied him the opportunity to aid in his rehabilitation, and as the result of his disability and the FDOC's failure to properly classify and house him, he died.

  26.  After going over Mr. Sullivan's 2/23/2012 document, I note the following: Mr. Sullivan's sole support for his statement that an "appropriate medical professional can set in motion the accommodation process and a mechanism is in place to proceed with the accommodation process" is FDOC Technical Instruction No. 15.03.25, Section IV, which states that "inmates are not to be housed in the infirmary unless it is for required medical care and that the housing decision is to be made by the Chief Health Officer." In Daniel Wolfe's case, however, this mechanism was clearly both inadequate and insufficient. My opinion is that it should have been obvious to corrections personnel that Mr. Wolfe needed a housing accommodation. Further, pursuant to these same rules, it is ultimately the warden who is responsible for the care and custody of all inmates assigned to him/her and must exercise his/her authority accordingly.

  27.  After going over Mr. Sullivan's 3/30/2012 document, I note the following:

    (a)  In my opinion, Mr. Sullivan's statement that "I found no indication in the documents provided that Mr. Wolfe was ever identified as an impaired inmate" shows the defects in the FDOC's system of identifying impaired inmates, considering that Mr. Wolfe had numerous medical emergencies, one in which he was pronounced dead and brought back to life by artificial means. For an ADA team, a medical department and a warden to fail to consider such a person for ADA status is highly inappropriate. To then assign this inmate to an area out of sight/sound/treatment observation was an even greater shortcoming at Lake C.I, one that ultimately lead to Mr. Wolfe's death.

    (b)  Throughout Mr. Sullivan's report he places the responsibility for obtaining ADA status on Mr. Wolfe. While Mr. Wolfe has the 'right' to request such an accommodation, it was the institution as a whole that was responsible for Mr. Wolfe's care/custody, and all corrections personnel should have been aware of that fact and responsibility, particularly after his near fatal asthma attack in November 2004.

**This opinion is based on the materials I have reviewed thus far.  I reserve the right to supplement this Report should new material become available to me.**

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of April, 2012.

Ronald (Ron) D. McAndrew